1  DOUGLAS GILLIES, SBN 53602

2  3756 Torino Drive
   Santa Barbara, CA 93105
3  (805) 682-7033
   douglasgillies@gmail.com
4
   *in pro per*
5

6

7              **SUPERIOR COURT, STATE OF CALIFORNIA**

8                **COUNTY OF SANTA BARBARA**

9

10 DOUGLAS GILLIES,                    Case No.    **1340786**

11              Plaintiff,              **Verified Complaint for Temporary
                                        Restraining Order, Preliminary and**
12          vs                         **Permanent Injunctions to Prevent
                                        Foreclosure Sale, Declaratory**
13 CALIFORNIA RECONVEYANCE CO.,        **Relief, and Damages**

14 JP MORGAN CHASE BANK N.A.,

15 and DOES 1-20

16              Defendants.

17

18 Plaintiff alleges

19                    **FIRST CAUSE OF ACTION**
                        **(Declaratory Relief)**
20

21 1.  Plaintiff DOUGLAS GILLIES is the owner and resident of a single-family residence

22 at 3756 Torino Drive, Santa Barbara, California, APN 049-111-04-00 ("the residence").

23 2.  Defendant CALIFORNIA RECONVEYANCE COMPANY ("CRC") is a California

24 corporation. Defendant JP MORGAN CHASE BANK, NATIONAL ASSOCIATION,

25 ("Chase") is an out-of-state business entity doing business in Santa Barbara County.

26 3.  Defendants Doe 1-20, inclusive, are sued under fictitious names. Their true names

27 and capacities are unknown to plaintiff. When their true names and capacities are

28 known, plaintiff will amend this complaint and insert their true names and capacities.

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SANTA BARBARA

NOV 25 2009

GARY M. BLAIR, Executive Officer
BY _____
JOSEPH GARNICA, Deputy Clerk

4.  On August 12, 2003, Plaintiff borrowed money from Washington Mutual Bank and signed a Promissory Note secured by a Deed of Trust conveying the residence in trust with power of sale to California Reconveyance Company.

5.  Washington Mutual Bank is named as lender and beneficiary in the Deed of Trust, which was recorded in Santa Barbara County, California on August 27, 2003.

6.  On August 12, 2009, defendant CRC mailed a Notice of Default to Plaintiff alleging a breach of the obligation secured by the Deed of Trust for the residence. A copy of the Notice of Default is attached as Exhibit "A".  Plaintiff is informed and believes that it has not been recorded

7.  On November 16, 2009, CRC posted a Notice of Trustee's Sale on the residence. A copy of the Notice of Trustee's Sale is attached as Exhibit "B". The date of the public auction sale is set for December 7, 2009.

8.  Cal. Civil Code § 2924 describes the requirements for a nonjudicial sale.

§ 2924 (a)(1) The trustee, mortgagee, or beneficiary, or any of their authorized agents shall first file for record, in the office of the recorder of each county wherein the mortgaged or trust property or some part or parcel thereof is situated, a notice of default...

9.  An actual controversy has arisen and now exists between plaintiff and defendants concerning their respective rights and duties. Plaintiff contends that defendants are not entitled to accelerate the maturity of the secured obligation and sell the residence on the grounds that they did not record a notice of default, whereas defendants assert that they will sell the residence at the Santa Barbara Courthouse on December 7, 2009.

**SECOND CAUSE OF ACTION**
**(Declaratory Relief)**

10.  Plaintiff refers to and incorporates Paragraphs 1-9.

11.  The Notice of Default (Ex. A) does not name the beneficiary or an authorized agent. It states, "To find out the amount you must pay, to arrange for payment to stop the foreclosure, or if the property is in foreclosure for any other reason, contact:

1  JPMorgan Chase Bank, National Association at 7301 Baymeadows Way, Jacksonville,

2  FL 32256." Chase's capacity is not described in the Notice of Default.

3  12.  California Civil Code § 2923.5 states that a Notice of Default may not be filed until

4  30 days after a mortgagee, a beneficiary, or an authorized agent has contacted the

5  borrower, accessed the borrower's financial situation, and explored options to avoid

6  foreclosure. The Notice of Default must include a declaration from one of those three

7  entities showing that it has contacted the borrower or tried with due diligence to contact

8  the borrower.

9  13.  The Notice of Default (Ex. A) does not include the declaration from the mortgagee,

10  the beneficiary, or the authorized agent required by § 2923.5. Rather, the Notice of

11  Default states disjunctively, "The beneficiary or its designated agent declares that it has

12  contacted the borrower..." This anonymous, ambiguous assertion does not specify who

13  made the missing declaration—the beneficiary or the agent—and it does not indicate

14  who contacted the borrower.

15  14.  In the absence of a § 2923.5 declaration, the Notice of Default is fatally defective.

16  15.  An actual controversy has arisen and now exists between plaintiff and defendants

17  concerning their respective rights and duties. Plaintiff contends that defendants are not

18  the real parties in interest and not entitled to accelerate the maturity of the secured

19  obligation and sell the residence because no beneficiary or authorized agent has

20  delivered, served, or recorded a notice of default that complies with Civil Code § 2923.5,

21  whereas defendants assert that they will sell the residence on December 7, 2009.

22
                            **THIRD CAUSE OF ACTION**
                      **(California Foreclosure Prevention Act)**
23

24  16.  Plaintiff refers to and incorporates Paragraphs 1-15.

25  17.  The California Foreclosure Prevention Act went into effect in June 2009. According

26  to Cal. Civil Code § 2923.52, lenders foreclosing on certain loans are prohibited from

27  giving a notice of sale until at least 90 days after the lapse of three months following the

28  filing of the Notice of Default, so long as the loan fulfills four requirements.  Plaintiff's

1   loan meets the first three requirements for the additional 90 days:

2        (1) The loan was recorded between January 1, 2003, and January 1, 2008;

3        (2) The loan is the first deed of trust that the property secures; and,

4        (3) Plaintiff occupied the property as his principal residence at the time

5   defendants allege the loan became delinquent.

6        The fourth requirement is that a notice of default has been recorded on the

7   property. This requirement can only be satisfied by defendants. It implies that if a notice

8   of default is not recorded, the conditions precedent for notice of sale have not been met.

9   18.  On November 16, 2009, CRC posted a Notice of Trustee's Sale on plaintiff's

10  residence. The time between the Notice of Default and the Trustee's Sale is 96 days.

11  19.  Civil Code § 2923.54 requires a declaration of exemption on the notice of sale in

12  order to bypass the 90-day extension. Section 2923.54 (a)(2) requires the loan servicer

13  to state, "*Whether* the extra 90-day timeframe for giving notice of sale specified in

14  subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or

15  2923.55."

16  20.  In an exhibit attached to defendants' Notice of Trustee's Sale (Ex. B), where Chase

17  is described as a "loan servicer," an unsigned statement attributed to Ann Thorn says:

18      "4. The timeline for giving notice of sale specified in subdivision (a) of Section

19      2923.52 does not apply pursuant to Section 2923.52 or Section 2923.55."

20  *Whether* means choose one or the other. Chase chooses either §§ 2923.52 or .55.

21  Therefore defendants' notice of Trustee's Sale does not comply with § 2923.54(a)(2).

22  21.  The Notice of Trustee's Sale states, "In compliance with California Civil Code

23  2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has

24  contacted the borrower(s) to assess their financial situation and to explore options to

25  avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their

26  financial situation and to explore options to avoid foreclosure by one of the following

27  methods: by telephone; by United States mail; either 1st class or certified; by overnight

28  delivery; by personal delivery; by email; by face to face meeting." No such declaration

1  is attached to the Notice of Trustee's Sale, nor is there any indication of who contacted

2  the borrower, whether it was the mortgagee, the trustee, the beneficiary, or an agent.

3  Again, defendants choose "all of the above" when § 2923.5 does not offer that option.

4  22.  An actual controversy has arisen and now exists between plaintiff and defendants

5  concerning their respective rights and duties. Plaintiff contends that defendants are not

6  authorized to publish, post, serve, or record a Notice of Trustee's Sale under § 2923.52

7  any sooner than March 7, 2010 – three months plus 90 days after recording the Notice

8  of Default – on the grounds that defendants have posted a Notice of Trustee's Sale that

9  fails to comply with Civ. Code §§ 2923.52, 2923.54, and 2924, whereas defendants

10 assert that they will sell the residence on December 7, 2009. A judicial declaration is

11 necessary and appropriate at this time in order that the parties may ascertain their rights

12 and duties under the note and trust deed.

13                          **FOURTH CAUSE OF ACTION**
                                      **(Injunction)**
14

15 23.  Plaintiff refers to and incorporates Paragraphs 1-22.

16 24.  Unless restrained, defendants will sell plaintiff's residence, or cause it to be sold, to

17 plaintiff's great and irreparable injury, for which pecuniary compensation would not

18 afford adequate relief.

19 25.  Defendants' wrongful conduct, unless and until restrained by order of this court,

20 will cause great irreparable injury to plaintiff as the value of the residence declines

21 under threat of foreclosure and plaintiff faces the prospect of eviction from his

22 residence.

23 26.  Plaintiff has no adequate remedy at law for the injuries currently being suffered and

24 that are threatened. It will be impossible for plaintiff to determine the precise amount of

25 damage that he will suffer if defendants' conduct is not restrained and plaintiff is forced

26 to institute a multiplicity of suits to obtain compensation for his injuries.

27 27.  As a proximate result of defendants' wrongful conduct, plaintiff has been damaged

28 in excess of $100,000.00. Plaintiff will be further damaged so long as defendants'

1    efforts to conduct an unauthorized sale continue. The full amount of this damage is not

2    now known to plaintiff, and plaintiff will amend this complaint to state the amount when it

3    becomes known.

4    WHEREFORE, plaintiff prays judgment against defendants as follows:

5    1.   For an order requiring defendants to show cause why they should not be enjoined

6    from selling the residence during the pendency of this action;

7    2.   For a temporary restraining order, a preliminary injunction, and a permanent

8    injunction, enjoining defendants, and all persons acting under, for, or in concert with

9    defendants from selling the residence or attempting to sell it or causing it to be sold,

10    either under power of sale pursuant to the trust deed or by foreclosure action, and from

11    posting, publishing, or recording a notice of default or notice of trustee's sale contrary to

12    state or federal law;

13    3.   For a declaration that the Notice of Default (Ex. A) and the Notice of Trustee's Sale

14    (Ex. B) are void as a matter of law;

15    4.   For damages in the sum of $100,000.00, plus damages in such further sums as may

16    be sustained and ascertained before final judgment;

17    5.   For reasonable attorney's fees and costs of suit incurred; and

18    6.   For other relief as the court deems proper.

19    November 24, 2009.

                                             Douglas Gillies, Plaintiff

21                           VERIFICATION

22    I, Douglas Gillies, am the plaintiff in the above-entitled action. I have read the foregoing

23    complaint and know its contents. The same is true of my own knowledge, except as to

24    those matters that are alleged on information and belief, and as to those matters, I

25    believe them to be true. I declare under penalty of perjury under the laws of the State of

26    California that the foregoing is true and correct.

27

28    November 24, 2009

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE CO.

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE CO.
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA  91311
800 892-6902
(818)775-2258 (Fax)

The following copy of the original of which was filed for record on 08/13/2009 in the office of the County Recorder of the County set forth below is sent to you in as much as an examination of the title of the trust property shows you may have an interest in the Trustee's Sale Proceedings.

CALIFORNIA RECONVEYANCE COMPANY, Trustee

---

Trustee Sale No. 237917CA   Loan No. 0081173676   Title Order No. 184926

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION**, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $10,367.71 as of 08/12/2009 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the above paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of property by paying the entire amount demanded by your creditor.



Exhibit "A"

Exhibit A- Pg. 13

Trustee Sale No. 237917CA   Loan No. 0081173676   Title Order No. 184926

To find out the amount you must pay, to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: JPMorgan Chase Bank, National Assocation at 7301 BAYMEADOWS WAY JACKSONVILLE FL 32256 (877) 926-8937.

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION. NOTICE IS HEREBY GIVEN THAT: CALIFORNIA RECONVEYANCE COMPANY is the duly appointed Trustee under a Deed of Trust dated 08/12/2003, executed by DOUGLES GILLIES, AN UNMARRIED MAN, as trustor, to secure obligations in favor of WASHINGTON MUTUAL BANK, FA, as Beneficiary Recorded 08/27/2003, Book , Page , Instrument 2003-0116698 of official records in the Office of the Recorder of SANTA BARBARA County, California, as more fully described on said Deed of Trust. APN: 049-111-04-00 Situs: 3756 TORINO DRIVE, , SANTA BARBARA, CA 93105 Including the note(s) for the sum of $500,000.00 that the beneficial interest under said Deed of Trust and the obligations secured thereby are presently held by the beneficiary; that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the payment has not been made of: THE 05/01/2009 INSTALLMENT OF PRINCIPAL AND INTEREST AND ALL SUBSEQUENT MONTHLY INSTALLMENTS OF PRINCIPAL AND INTEREST; PLUS ANY ADDITIONAL ACCRUED AND UNPAID AMOUNTS INCLUDING, BUT NOT LIMITED TO, LATE CHARGES, ADVANCES, IMPOUNDS, TAXES, HAZARD INSURANCE, ADMINISTRATIVE FEES, INSUFFICIENT AND PARTIAL RETURN CHECK FEES, STATEMENT FEES, AND OBLIGATIONS SECURED BY PRIOR ENCUMBRANCES.

That by reason thereof, the present beneficiary under such Deed of Trust, has executed and delivered to said Trustee, a written Declaration and Demand for Sale, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing the obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The beneficiary or its designated agent declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code 2923.5, or the borrower has surrendered the property to the beneficiary or authorized agent, or is otherwise exempt from the requirements of §2923.5.

**DATE: 08/12/2009**

**California Reconveyance Company, as Trustee**

Original document is signed

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Exhibit A- Pg. 14

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue – CA2-4379
Chatsworth, CA 91311
800-892-6902

| | |
|---|---|
| **Trustee Sale No.** | **237917CA** |
| Loan No. | 0081173676 |
| Title Order No. | 184926 |

# NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 08/12/2003. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On 12/07/2009 at 01:00 PM, CALIFORNIA RECONVEYANCE COMPANY as the duly appointed Trustee under and pursuant to Deed of Trust Recorded 08/27/2003, Book , Page , Instrument 2003-0116698 of official records in the Office of the Recorder of SANTA BARBARA County, California, executed by: DOUGLES GILLIES, AN UNMARRIED MAN, as Trustor, WASHINGTON MUTUAL BANK, FA, as Beneficiary, will sell at public auction sale to the highest bidder for cash, cashier's check drawn by a state or national bank, a cashier's check drawn by a state or federal credit union, or a cashier's check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state. Sale will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to the Deed of Trust. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, interest thereon, estimated fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.
Place of Sale: AT THE MAIN ENTRANCE TO THE COUNTY COURTHOUSE, 1100 ANACAPA STREET , SANTA BARBARA, CA

Legal Description: LOT 70 OF HIDDEN VALLEY, IN THE CITY OF SANTA BARBARA, COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 52 PAGES 26 TO 32, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.
 EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND, BUT WITHOUT THE RIGHT OF ENTRY ONTO THE SURFACE OR THAT PORTION OF SUBSURFACE OF SAID LAND LYING ABOVE A DEPTH OF 500 FEET BELOW THE SURFACE THEREOF.
Amount of unpaid balance and other charges: $509,202.61 (estimated)
Street address and other common designation of the real property:    3756 TORINO DRIVE
                                                                     SANTA BARBARA, CA 93105
                                                                     APN Number:  049-111-04-00

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. The property heretofore described is being sold "as is".

In compliance with California Civil Code 2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their financial situation and to explore options to avoid foreclosure by one of the following methods: by telephone; by United States mail; either 1st class or certified; by overnight delivery; by personal delivery; by e-mail; by face to face meeting.



Exhibit "B"                    Exhibit A- Pg. 15

**SEE ATTACHED EXHIBIT**

DATE: 11-16-2009
CALIFORNIA RECONVEYANCE COMPANY, as Trustee
714) 730-2727 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

*Deborah Brignac*

DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVENUE, CHATSWORTH, CA 91311

> CALIFORNIA RECONVEYANCE COMPANYIS A
> DEBT COLLECTOR ATTEMPTING TO COLLECT
> A DEBT. ANY INFORMATIONOBTAINED WILL
> BE USED FOR THAT PURPOSE.

Exhibit A- Pg. 16

Exhibit

## DECLARATION PURSUANT TO CALIFORNIA CIVIL CODE SECTION 2923.54

Pursuant to California Civil Code Section 2923.54, the undersigned loan servicer declares as
follows:

1.   It has obtained from the commissioner a final or temporary order of exemption pursuant to
     Section 2923.54 that is current and valid on the date the notice of sale is filed; and

2.   The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52
     does not apply pursuant to Section 2923.52 or Section 2923.55.

JPMorgan Chase Bank,
National Association

Name:  Ann Thorn
Title:    First Vice President



Exhibit A- Pg. 17

1  DOUGLAS GILLIES, SBN 53602

2  3756 Torino Drive
   Santa Barbara, CA 93105
3  (805) 682-7033
   douglasgillies@gmail.com
4
   *in pro per*
5

6

7                    **SUPERIOR COURT, STATE OF CALIFORNIA**

8                         **COUNTY OF SANTA BARBARA**

9

10  DOUGLAS GILLIES,                          Case No.   **1340786**

11                    Plaintiff,              **Points and Authorities in Support of**
                                              **Temporary Restraining Order,**
12                    vs                      **Preliminary and Permanent**
                                              **Injunctions to Prevent Foreclosure**
13  CALIFORNIA RECONVEYANCE CO.,              **Sale, Declaratory Relief and**
                                              **Damages**
14  JP MORGAN CHASE BANK N.A.,

15  and DOES 1-20

16                    Defendants.

17

18                **1. The Notice of Default must be recorded.**

19  Civil Code § 2924 states the requirement that a Notice of Default must be recorded

20  before proceeding to a nonjudicial sale:

21      **Civil Code § 2924**

22      (a) ...a power of sale ... shall not be exercised except where the mortgage or

23      transfer is made pursuant to an order, judgment, or decree of a court of

24      record...until all of the following apply:

25      (1) The trustee, mortgagee, or beneficiary, or any of their authorized agents shall

26      first file for record, in the office of the recorder of each county wherein the

27      mortgaged or trust property or some part or parcel thereof is situated, a notice of

28      default. That notice of default shall include all of the following:

Exhibit A- Pg. 18

---

FILED
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

NOV 2 5 2009

GARY M. BLAIR, Executive Officer
BY _____
JOSEPH GARNICA, Deputy Clerk

1   (1) (A) through (D) omitted.

2   (2) Not less than three months shall elapse from the filing of the notice of default.

3   (3) After the lapse of the three months described in paragraph (2), the

4   mortgagee, trustee or other person authorized to take the sale shall give notice of

5   sale, stating the time and place thereof, in the manner and for a time not less

6   than that set forth in Section 2924f.

7   Plaintiff searched the records of the Santa Barbara County Recorder on November

8   17, 2009, and found no indication that the Notice of Default had been recorded. If

9   the Notice of Default (Ex. A) was not recorded, the Trustee's Sale must be enjoined.

10

11              **2. The Notice of Default must include a Declaration**

12   Civil Code § 2923.5 added a requirement that a Notice of Default must include a

13   declaration by one of three entities describing its attempts to contact the borrower.

14       **Civil Code § 2923.5**

15   (a) (1) A mortgagee, trustee, beneficiary, or authorized agent may not file a

16   notice of default pursuant to Section 2924 until 30 days after contact is made as

17   required by paragraph (2) or 30 days after satisfying the due diligence

18   requirements as described in subdivision (g).

19       (2) A mortgagee, beneficiary, or authorized agent shall contact the borrower in

20   person or by telephone in order to assess the borrower's financial situation and

21   explore options for the borrower to avoid foreclosure. During the initial contact,

22   the mortgagee, beneficiary, or authorized agent shall advise the borrower that he

23   or she has the right to request a subsequent meeting and, if requested, the

24   mortgagee, beneficiary, or authorized agent shall schedule the meeting to occur

25   within 14 days. The assessment of the borrower's financial situation and

26   discussion of options may occur during the first contact, or at the subsequent

27   meeting scheduled for that purpose. In either case, the borrower shall be

28   provided the toll-free telephone number made available by the United States

1    Department of Housing and Urban Development (HUD) to find a HUD-certified

2    housing counseling agency. Any meeting may occur telephonically.

3    (b) A notice of default filed pursuant to Section 2924 shall include **a declaration**

4    **from the mortgagee, beneficiary, or authorized agent** that it has contacted the

5    borrower, tried with due diligence to contact the borrower as required by this

6    section, or the borrower has surrendered the property to the mortgagee, trustee,

7    beneficiary, or authorized agent.

8    (c) through (f) omitted.

9    (g) A notice of default may be filed pursuant to Section 2924 when a mortgagee,

10   beneficiary, or authorized agent has not contacted a borrower as required by

11   paragraph (2) of subdivision (a) provided that the failure to contact the borrower

12   occurred despite the due diligence of the mortgagee, beneficiary, or authorized

13   agent. For purposes of this section, "due diligence" shall require and mean all of

14   the following: …

15   (g) (1) through (5) omitted

16   (h) through (j) omitted

17   The Notice of Default (Ex. A) does not include any declaration from the mortgagee,

18   the beneficiary, or the authorized agent as required by § 2923.5. Rather, the Notice of

19   Default states disjunctively, "The beneficiary or its designated agent declares that it

20   has contacted the borrower..." This anonymous, ambiguous assertion does not specify

21   who made the missing declaration—the beneficiary or the agent—and it does not

22   indicate who contacted the borrower. Given a choice between (a) (b) or (c),

23   defendants picked (b) *and* (c). But that was not an option under the statute.

24   In the absence of the prescribed § 2923.5 declaration, the Notice of Default is fatally

25   defective.

26

27   **3. The Waiting Period between Notice of Default and Notice of Sale is 180 days**

28   The three-month waiting period between a Notice of Default and a Notice of Sale was

1    extended by an additional 90 days in Civil Code § 2923.52, the California Foreclosure

2    Prevention Act, signed by the Governor on June 15, 2009,

3    **Civil Code § 2923.52.**

4    (a) Notwithstanding paragraph (3) of subdivision (a) of Section 2924, a

5    mortgagee, trustee, or other person authorized to take sale shall not give notice

6    of sale until at least 90 days after the lapse of three months as set forth in

7    paragraph (2) of subdivision (a) of Section 2924, in order to allow the parties to

8    pursue a loan modification to prevent foreclosure, if all of the following conditions

9    exist:

10       (1) The loan was recorded during the period of January 1, 2003, to January 1,

11    2008, inclusive, and is secured by residential real property.

12       (2) The loan at issue is the first mortgage or deed of trust that the property

13    secures.

14       (3) The borrower occupied the property as the borrower's principal residence at

15    the time the loan became delinquent.

16       (4) The notice of default has been recorded on the property.

17    (b) This section does not apply to loans serviced by a mortgage loan servicer if

18    that mortgage loan servicer has obtained a temporary or final order of exemption

19    pursuant to Section 2923.53 that is current and valid at the time the notice of sale

20    is given.

21 An inference can be drawn from (4), the requirement that the notice of default must be

22 recorded. Since this requirement is incumbent upon the trustee, it would not make

23 sense to relieve the trustee of the additional 90 days if he neglects to record the notice

24 of default. It follows that the sale must not proceed if the notice has not been recorded.

25 Defendants' Notice of Trustee's Sale does not comply with Civil Code § 2923.54,

26 which requires a declaration of exemption on the notice of sale and a specification of

27 the statutory basis for the exemption in order to bypass the legislature's 90-day

28 extension.

§ 2923.54 (a) A notice of sale filed pursuant to Section 2924f shall include a declaration from the mortgage loan servicer stating both of the following:

(1) Whether or not the mortgage loan servicer has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.53 that is current and valid on the date the notice of sale is filed.

(2) Whether the timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or 2923.55.

An exhibit attached to defendants' Notice of Trustee's Sale reads:

Exhibit

DECLARATION PURSUANT TO CALIFORNIA CIVIL CODE SECTION 2923.54

Pursuant to California Civil Code Section 2923.54, the undersigned loan servicer declares as follows:

3. It has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.54 that is current and valid on the date the notice of sale is filed; and

4. The timeline for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or Section 2923.55.

JPMorgan Chase Bank, National Association

Name: Ann Thorn   Title: First Vice President

Neither Washington Mutual nor California Reconveyance Co. has obtained an exemption from the 90-day extension pursuant to § 2923.53. Chase's authority as loan servicer is based solely on its representation in the above exhibit where it says, "the undersigned loan servicer declares as follows..." There is no other designation of Chase's interest in the residence in the attached Exhibits A and B. Paragraphs 1 and 2 of Chase's exhibit are missing.  Paragraph 3 states that Chase obtained an order of exemption pursuant to § 2923.54. However, Civil Code § 2923.54

Exhibit A- Pg 22

1  (a)(1) requires the loan servicer to state, "(1) Whether or not it has obtained an order

2  of exemption pursuant to *Section 2923.53*." Since the notice of sale did not include a

3  declaration from the loan servicer stating whether or not it had obtained an exemption

4  pursuant to § 2923.53, the Notice of Trustee's Sale is subject to the 90-day extension.

5  Section 2923.54 (a)(2) requires the loan servicer to state, "*Whether* the extra 90-day

6  timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does

7  not apply pursuant to Section 2923.52 or 2923.55."

8  Chase's exhibit says:

9      "4. The timeline for giving notice of sale specified in subdivision (a) of Section

10     2923.52 does not apply pursuant to Section 2923.52 or Section 2923.55."

11

12  *Whether* means the declarant must choose one or the other. Chase chooses either

13  §§ 2923.52 or 2923.55, defeating the statutory intent to require disclosure of which

14  section is relied upon to avoid the 90-day extension.

15  Defendants' Notice of Trustee's Sale does not comply with § 2923.54(a)(2). Therefore,

16  the Notice of Trustee's Sale does not satisfy the requirements for an exception from

17  the 90-day extension.

18

19  Respectfully submitted,

20

21  November 24, 2009

22                          Douglas Gillies, Plaintiff *in pro per*

23

24

25

26

27

28

1  DOUGLAS GILLIES, SBN 53602

2  3756 Torino Drive
   Santa Barbara, CA 93105
3  (805) 682-7033
   dpuglasgillies@gmail.com
4
   *In pro per*
5

6

7                    SUPERIOR COURT, STATE OF CALIFORNIA

8                        COUNTY OF SANTA BARBARA

9

10 DOUGLAS GILLIES,                    )    Case No.      1340786
                                       )
11                      Plaintiff,     )    **First Amended Complaint for**
                                       )    **Declaratory Relief, Injunction to**
12               vs                    )    **Prevent Foreclosure Sale, Damages,**
                                       )    **and to Quiet Title**
13 CALIFORNIA RECONVEYANCE CO.,        )
                                       )
14 JP MORGAN CHASE BANK N.A.,          )
                                       )
15 and DOES 1-20                       )
                                       )
16                      Defendants.    )

17

18 Plaintiff alleges

19                        **FIRST CAUSE OF ACTION**
                              **(Declaratory Relief)**
20

21 1.  Plaintiff DOUGLAS GILLIES is the owner and resident of a single-family residence at 3756

22 Torino Drive, Santa Barbara, California, APN 049-111-04-00 ("the residence").

23 2.  Defendant CALIFORNIA RECONVEYANCE COMPANY ("CRC") is a California corporation.

24 Defendant JP MORGAN CHASE BANK, NATIONAL ASSOCIATION, ("Chase") is an out-of-

25 state business entity doing business in Santa Barbara County.

26 3.  Defendants Doe 1-20, inclusive, are sued under fictitious names. Their true names and

27 capacities are unknown to plaintiff. When their true names and capacities are known, plaintiff

28 will amend this complaint and insert their true names and capacities. Plaintiff is informed and

                           First Amended Complaint - 1

1   believes and thereon alleges that each of these fictitiously named defendants claim some right,

2   title, estate, lien, or interest in the residence adverse to plaintiff's title and their claims, and each

3   of them, constitute a cloud on plaintiff's title to the property.

4   4. On August 12, 2003, Plaintiff borrowed money from Washington Mutual Bank and signed a

5   Promissory Note secured by a Deed of Trust conveying the residence in trust with power of sale

6   to California Reconveyance Company.

7   5. Washington Mutual Bank is named as lender and beneficiary in the Deed of Trust, which

8   was recorded in Santa Barbara County, California on August 27, 2003.

9   6. On August 12, 2009, defendant CRC mailed a Notice of Default to Plaintiff alleging a breach

10  of the obligation secured by the Deed of Trust for the residence. A copy of the Notice of Default

11  is attached as Exhibit "A". Plaintiff is informed and believes that it has not been recorded.

12  7. On November 16, 2009, CRC posted a Notice of Trustee's Sale on the residence. A copy of

13  the Notice of Trustee's Sale is attached as Exhibit "B". The date of the public auction sale was

14  set for December 7, 2009.

15  8. Cal. Civil Code § 2924 describes the requirements for a nonjudicial sale.

16  § 2924 (a)(1) The trustee, mortgagee, or beneficiary, or any of their authorized agents

17  shall first file for record, in the office of the recorder of each county wherein the mortgaged

18  or trust property or some part or parcel thereof is situated, a notice of default...

19  9. An actual controversy has arisen and now exists between plaintiff and defendants

20  concerning their respective rights and duties. Plaintiff contends that defendants are not entitled

21  to accelerate the maturity of the secured obligation and sell the residence on the grounds that

22  they did not record a notice of default, whereas defendants assert that they are entitled to sell

23  the residence at the Santa Barbara Courthouse.

24                          **SECOND CAUSE OF ACTION**
                                **(Declaratory Relief)**
25

26  10. Plaintiff refers to and incorporates Paragraphs 1-9.

27  11. The Notice of Default (Ex. A) does not name the beneficiary or an authorized agent. It

28  states, "To find out the amount you must pay, to arrange for payment to stop the foreclosure, or

First Amended Complaint - 2

1  | if the property is in foreclosure for any other reason, contact: JPMorgan Chase Bank, National

2  | Association at 7301 Baymeadows Way, Jacksonville, FL 32256." Chase's capacity is not

3  | described in the Notice of Default.

4  | 12.   California Civil Code § 2923.5 states that a Notice of Default may not be filed until 30 days

5  | after a mortgagee, a beneficiary, or an authorized agent has contacted the borrower, accessed

6  | the borrower's financial situation, and explored options to avoid foreclosure. The Notice of

7  | Default must include a declaration from one of those three entities showing that it has contacted

8  | the borrower or tried with due diligence to contact the borrower.

9  | 13.   The Notice of Default (Ex. A) does not include the declaration from the mortgagee, the

10 | beneficiary, or the authorized agent required by § 2923.5. Rather, the Notice of Default states

11 | disjunctively, "The beneficiary or its designated agent declares that it has contacted the

12 | borrower..." This anonymous, ambiguous assertion does not specify who made the missing

13 | declaration—the beneficiary or the agent—and it does not indicate who contacted the borrower.

14 | 14.   In the absence of a § 2923.5 declaration, the Notice of Default is fatally defective.

15 | 15.   An actual controversy has arisen and now exists between plaintiff and defendants

16 | concerning their respective rights and duties. Plaintiff contends that defendants are not the real

17 | parties in interest and not entitled to accelerate the maturity of the secured obligation and sell

18 | the residence because no beneficiary or authorized agent has delivered, served, or recorded a

19 | notice of default that complies with Civil Code § 2923.5, whereas defendants assert that they

20 | are entitled to sell the residence.

### THIRD CAUSE OF ACTION
### (California Foreclosure Prevention Act)

23 | 16.   Plaintiff refers to and incorporates Paragraphs 1-15.

24 | 17.   The California Foreclosure Prevention Act went into effect in June 2009. According to Cal.

25 | Civil Code § 2923.52, lenders foreclosing on certain loans are prohibited from giving a notice of

26 | sale until at least 90 days after the lapse of three months following the filing of the Notice of

27 | Default, so long as the loan fulfills four requirements.  Plaintiff's loan meets the first three

28 | requirements for the additional 90 days:

First Amended Complaint - 3

1.   (1) The loan was recorded between January 1, 2003, and January 1, 2008;

2.   (2) The loan is the first deed of trust that the property secures; and,

3.   (3) Plaintiff occupied the property as his principal residence at the time defendants

4   allege the loan became delinquent.

5       The fourth requirement is that a notice of default has been recorded on the property.

6   This requirement can only be satisfied by defendants. It implies that if a notice of default is not

7   recorded, the conditions precedent for notice of sale have not been met.

8   18.   On November 16, 2009, CRC posted a Notice of Trustee's Sale on plaintiff's residence.

9   The time between the Notice of Default and the scheduled Trustee's Sale was 96 days.

10   19.   Civil Code § 2923.54 requires a declaration of exemption on the notice of sale in order to

11   bypass the 90-day extension. Section 2923.54 (a)(2) requires the loan servicer to state,

12   "*Whether* the extra 90-day timeframe for giving notice of sale specified in subdivision (a) of

13   Section 2923.52 does not apply pursuant to Section 2923.52 or 2923.55."

14   20.   In an exhibit attached to defendants' Notice of Trustee's Sale (Ex. B), where Chase is

15   described as a "loan servicer," an unsigned statement attributed to Ann Thorn says:

16       "4. The timeline for giving notice of sale specified in subdivision (a) of Section 2923.52

17       does not apply pursuant to Section 2923.52 or Section 2923.55."

18   *Whether* means choose one or the other. Chase chooses either §§ 2923.52 or .55. Therefore

19   defendants' notice of Trustee's Sale does not comply with § 2923.54(a)(2). .   _   .   ..

20   21.   The Notice of Trustee's Sale states, "In compliance with California Civil Code 2923.5(c) the

21   mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the

22   borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or that

23   it has made efforts to contact the borrower(s) to assess their financial situation and to explore

24   options to avoid foreclosure by one of the following methods: by telephone; by United States

25   mail; either 1st class or certified; by overnight delivery; by personal delivery; by email; by face to

26   face meeting." No such declaration is attached to the Notice of Trustee's Sale, nor is there any

27   indication of who contacted the borrower, whether it was the mortgagee, the trustee, the

28   beneficiary, or an agent. Again, defendants choose "all of the above" when § 2923.5 does not

First Amended Complaint - 4

Exhibit B- Pg. 27

1   offer that option.

2   22.   An actual controversy has arisen and now exists between plaintiff and defendants

3   concerning their respective rights and duties. Plaintiff contends that defendants are not

4   authorized to publish, post, serve, or record a Notice of Trustee's Sale under § 2923.52 any

5   sooner than March 7, 2010 – three months plus 90 days after recording the Notice of Default –

6   on the grounds that defendants have posted a Notice of Trustee's Sale that fails to comply with

7   Civ. Code §§ 2923.52, 2923.54, and 2924, whereas defendants assert that they were entitled to

8   sell the residence on December 7, 2009. A judicial declaration is necessary and appropriate at

9   this time in order that the parties may ascertain their rights and duties under the note and trust

10   deed.

### FOURTH CAUSE OF ACTION
### (Injunction)

13   23.   Plaintiff refers to and incorporates Paragraphs 1-22.

14   24.   Unless restrained, defendants will sell plaintiff's residence, or cause it to be sold, to

15   plaintiff's great and irreparable injury, for which pecuniary compensation would not afford

16   adequate relief.

17   25.   Defendants' wrongful conduct, unless and until restrained by order of this court, will cause

18   great irreparable injury to plaintiff as the value of the residence declines under threat of

19   foreclosure and plaintiff faces the prospect of eviction from his residence.

20   26.   Plaintiff has no adequate remedy at law for the injuries currently being suffered and that

21   are threatened. It will be impossible for plaintiff to determine the precise amount of damage that

22   he will suffer if defendants' conduct is not restrained and plaintiff is forced to institute a

23   multiplicity of suits to obtain compensation for his injuries.

24   27.   As a proximate result of defendants' wrongful conduct, plaintiff has been damaged in

25   excess of $100,000.00. Plaintiff will be further damaged so long as defendants' efforts to

26   conduct an unauthorized sale continue. The full amount of this damage is not now known to

27   plaintiff, and plaintiff will amend this complaint to state the amount when it becomes known.

28   ///

## FIFTH CAUSE OF ACTION
### (Quiet Title)

23.  Plaintiff refers to and incorporates Paragraphs 1-27.

24.  Plaintiff is the sole owner of the residence. The basis of plaintiff's title is a deed from Joan
R. Landecker granting the residence in fee simple to plaintiff Douglas Gillies and Linda Gillies as
community property dated March 27, 1992, and recorded in the Official Records of the County
of Santa Barbara, CA, on April 30, 1992, followed by an interspousal transfer deed dated July 8,
1997, granting the residence to plaintiff and recorded in the Official Records of the County of
Santa Barbara, CA, on July 16, 1997.

25.  Plaintiff is informed and believes and on such information and belief alleges that
Defendants CRC and Chase claim an interest adverse to plaintiff in the residence as assignees,
beneficiaries or holders of the Promissory Note and Deed of Trust described hereinabove in
Paragraphs 4 and 5, which was recorded in Santa Barbara County, California on August 27,
2003. Some of the defendants claim interests in the property adverse to plaintiff as assignees
and successors of Washington Mutual Bank.

26.  Plaintiff is seeking to quiet title against the claims of defendants. The claims of defendants
are without any right whatever and such defendants have no right, title, estate, lien, or interest
whatever in the residence or any part thereof.

27.  Plaintiff seeks to quiet title as of November 25, 2009.

///

WHEREFORE, plaintiff prays judgment against defendants as follows:

1.  For an order requiring defendants to show cause why they should not be enjoined from
selling the residence during the pendency of this action;

2.  For a temporary restraining order, a preliminary injunction, and a permanent injunction,
enjoining defendants, and all persons acting under, for, or in concert with defendants from
selling the residence or attempting to sell it or causing it to be sold, either under power of sale
pursuant to the trust deed or by foreclosure action, and from posting, publishing, or recording a
notice of default or notice of trustee's sale contrary to state or federal law;

First Amended Complaint - 6

3. For a declaration that the Notice of Default (Ex. A) and the Notice of Trustee's Sale (Ex. B) are void as a matter of law;

4. For damages in the sum of $100,000.00, plus damages in such further sums as may be sustained and ascertained before final judgment;

5. For a judgment that plaintiff is the owner in fee simple of the property and that defendants have no interest in the property adverse to the plaintiff;

6. For reasonable attorney's fees and costs of suit incurred; and

7. For other relief as the court deems proper.

December 23, 2009.

Douglas Gillies, Plaintiff

VERIFICATION

I, Douglas Gillies, am the plaintiff in the above-entitled action. I have read the foregoing First Amended Complaint and know its contents. The same is true of my own knowledge, except as to those matters that are alleged on information and belief, and as to those matters, I believe them to be true. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

December 23, 2009

First Amended Complaint - 7

Exhibit B- Pg. 30

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

> California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SIX

| | |
|---|---|
| DOUGLAS GILLIES, | 2d Civil No. B224995 |
| Plaintiff and Appellant, | (Super. Ct. No. 1340786) |
| | (Santa Barbara County) |
| v. | |
| | COURT OF APPEAL-SECOND DIST. |
| CALIFORNIA RECONVEYANCE CO. et al., | F I L E D |
| | APR 1 1 2011 |
| Defendants and Respondents. | JOSEPH A. LANE, Clerk |

Plaintiff is the owner of real property subject to a foreclosure. He files in propria persona a complaint against the bank and trustee. The complaint attempts to state causes of action for declaratory relief, injunction, quiet title and damages. The trial court sustained the defendants' demurrer without leave to amend. Plaintiff appeals the ensuing judgment. We affirm.

### FACTS

Douglas Gillies's first amended complaint alleges as follows:

Gillies is the owner of a single family residence in Santa Barbara. In August 2003, he borrowed money from Washington Mutual Bank. The loan is secured by a deed of trust on his residence.

Exhibit C- Pg. 31

*First Cause of Action*

On August 12, 2009, the California Reconveyance Company (CRC), as trustee under the deed of trust, mailed Gillies a notice of default. Gillies alleged on information and belief that the notice was not recorded. The failure to record the notice violated Civil Code section 2924, subdivision (a)(1).[1]

*Second Cause of Action*

The notice of default does not comply with section 2923.5. The section provides that a notice of default may not be filed until 30 days after a mortgagee, beneficiary or authorized agent has contacted the borrower to assess the borrower's financial situation and explore options to avoid foreclosure. Subdivision (b) of the section requires a notice of default to include a declaration that the mortgagee, beneficiary or authorized agent has so contacted the borrower. The declaration contained in the notice of default is insufficient in that it states disjunctively, "the beneficiary or its authorized agent declares that it has contacted the borrower[.]"  The declaration does not specify whether the borrower or its agent contacted the borrower or made the declaration.

*Third Cause of Action*

Section 2923.52 prohibits lenders from giving a notice of sale until at least 90 days following 3 months after the filing of the notice of default. A lender may be exempt from the 90-day extension of time. Section 2923.54, subdivision (a)(2) requires the notice of sale to include a declaration from the mortgage loan servicer stating: "Whether the timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or 2923.55."[2]

---

[1] All statutory references are to the Civil Code unless otherwise stated.

[2] (§§ 2923.52, 2923.54 & 2923.55 were added by Stats. (2009-2010, 2d Ex. Sess.) ch. 5, Assem. Bill 7, § 3, eff. May 21, 2009, and repealed by their own terms, operative Jan. 1, 2011; see also 2009 Cal. Legis. Serv.(2009-2010 2d Ex. Sess.), ch. 5, Assem. Bill 7.)

2

Exhibit C- Pg. 32

JPMorgan Chase Bank, National Association (Chase) is identified in an exhibit attached in the notice of sale as the loan servicer. Ann Thorn, identified as Chase's First Vice President declared: "Pursuant to California Civil Code Section 2923.54, the undersigned loan servicer declares as follows: [¶] "3. It has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.54 that is current and valid on the date the notice of sale is filed; and [¶] 4. The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or Section 2923.55."

The notice of sale was served 96 days after the notice of default. Thorn's declaration does not specify whether the exemption from the timeframe in section 2923.52 was pursuant to section 2923.52 or 2923.55.

### Fourth and Fifth Causes of Action

The fourth cause of action petitions for an injunction to prevent sale of the residence. The fifth cause of action is for quiet title. It alleges the defendants have no right, title, lien or interest in the residence.

Chase and CRC (collectively Chase) demurred to the first amended complaint. Chase requested that the trial court take judicial notice of the following: (a) the Office of Thrift Supervision order directing the FDIC to act as receiver for Washington Mutual; (b) the purchase and assumption agreement between the FDIC, as receiver for Washington Mutual, and Chase; (c) the notice of default recorded August 13, 2009; and (d) the notice of sale recorded November 18, 2009.

The trial court granted Chase's request to take judicial notice, and sustained Chase's demurrer without leave to amend.

### DISCUSSION

### I

Because this case comes to us on demurrer, we accept as true all of the complaint's allegations of material facts. (*Al Holding Co. v. O'Brien & Hicks, Inc.* (1999) 75 Cal.App.4th 1310, 1312.) But we do not accept as true contentions, deductions or conclusions of fact or law. (*Moore v. Regents of University of*

3

Exhibit C- Pg. 33

*California* (1990) 51 Cal.3d 120, 125.)  We also read the complaint as though it
included matters of which the trial court has properly taken judicial notice. (Code Civ.
Proc., § 430.30, subd. (a).)  If it appears the plaintiff is entitled to any relief, the
complaint will be held good. (*Chase Chemical Co. v. Hartford Acc. & Indemn. Co.*
(1984) 159 Cal.App.3d 229, 242.)

## II

### (a)

The trial court properly sustained the demurrer to Gillies's first cause of
action.  The complaint alleged the notice of default was not recorded as required by
section 2924, subdivision (a)(1).  The trial court properly took judicial notice that the
notice of default was recorded on August 13, 2009.

### (b)

The trial court properly sustained the demurrer to the second cause of
action.  Gillies complained that the declaration made pursuant to section 2923.5,
subdivision (b) was defective.  The subdivision requires a declaration that the
mortgagee, beneficiary or authorized agent has contacted the borrower to assess the
borrower's financial situation and explore options to avoid foreclosure.  Gillies
objected that the declaration given here was in the disjunctive, and simply tracked the
statutory language.  Thus it does not specify who contacted the borrower or who made
the declaration.

But the trial court took judicial notice of the notice of default.  It shows
the declaration was made by Stacy White, Assistant Secretary of CRC.

Moreover, *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208,
concluded that the declaration need do no more than track the statutory language.  The
court stated: "In light of what we have just said about the multiplicity of persons who
would necessarily have to sign off on the precise category in section 2923.5,
subdivision (b) . . . that would apply in order to proceed with foreclosure (contact by
phone, contact in person, unsuccessful attempts at contact by phone or in person,
bankruptcy, borrower hiring a foreclosure consultant, surrender of keys), and the

Exhibit C- Pg. 34

possibility that such persons might be employees of not less than three entities (mortgagee, beneficiary, or authorized agent), there is no way we can divine an intention on the part of the Legislature that each notice of foreclosure be custom drafted. [¶] To which we add this important point: By construing the notice requirement of section 2923.5, subdivision (b), to require only that the notice track the language of the statute itself, we avoid the problem of the imposition of costs beyond the minimum costs now required by our reading of the statute." (*Id.* at p. 235.) The declaration here is sufficient.

Gillies requests that we take judicial notice of a trial court ruling in an unrelated case. The court ruled that the notice of default contained the language required by section 2923.5. But because the declaration was not under penalty of perjury, it had "no evidentiary value concerning whether the Defendant otherwise satisfied the provisions of Civil Code Section 2923.5."

In reviewing a ruling on a demurrer we are not concerned with "evidentiary value." We are solely concerned with the allegations of the complaint. Here the complaint alleges only that the notice of default is defective in form. It does not allege that the substantive requirements of section 2923.5, subdivision (a)(2), mandating contacting the borrower, were not in fact carried out. The request to take judicial notice is denied.

(c)

The trial court properly sustained the demurrer to Gillies's third cause of action. There Gillies alleged the notice of sale was defective because it failed to specify whether the exemption from the timeframe in section 2923.52 was pursuant to section 2923.52 or 2923.55.

Section 2923.54, subdivision (a)(2) requires the notice of sale to include a declaration stating, "Whether the timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or 2923.55."

Exhibit C- Pg. 35

The subdivision simply requires the notice of sale to state whether the timeframe specified in section 2923.52 does not apply pursuant to either code section. The subdivision does not require the notice of sale to specify under which of the two code sections the mortgage loan servicer is claiming an exemption.

(d)

The fourth cause of action for injunctive relief is derivative of the first three causes of action. Thus the trial court properly sustained the demurrer to the fourth cause of action.

(e)

The fifth cause of action is to quiet title against Chase. The trial court sustained Chase's demurrer to the fifth cause of action on the ground that a mortgagor cannot quiet title against the mortgagee without paying the debt. (Citing *Miller v. Provost* (1994) 26 Cal.App.4th 1703, 1707.)

Gillies argues, however, that Chase is not the mortgagee. He points out that Washington Mutual Bank is named beneficiary of the trust deed.

Here the trial court took judicial notice of the purchase and assumption agreement between the Federal Deposit Insurance Corporation (FDIC) as receiver for Washington Mutual Bank and Chase. The agreement provides that Chase purchases "all right, title and interest of the Receiver in and to all of the assets" of Washington Mutual Bank. The agreement also states that Chase "specifically purchases all mortgage servicing rights and obligations of [Washington Mutual Bank]." The agreement is maintained on the FDIC's official government website, and is not reasonably subject to dispute. Thus it contains facts that may be judicially noticed. (Evid. Code, § 452, subd. (h) [allows the court to take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy"].)

There is simply no reasonable dispute that Chase is Washington Mutual Bank's successor-in-interest as to Gillies's trust deed. The trial court properly sustained Chase's demurrer to the fifth cause of action.

6

Exhibit C- Pg. 36

## III

In Gillies's brief on appeal he also alleges defects that do not appear on the face of the complaint. Ordinarily, we confine our review of a ruling on a demurrer to matters appearing on the face of the complaint and matters of which the trial court took judicial notice. (See 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading §§ 947, p. 360 & 948, p. 362.) It is possible Gillies is arguing he could have amended his complaint. A brief discussion of the additional allegations will show an amendment would not have helped.

Gillies points out that the notice of default misspells his first name Dougles, instead of the correct "*Douglas*." But no reasonable person would be confused by such a minor error. Gillies last name is spelled correctly and the notice contains the street address of the property as well as the assessor's parcel number. Moreover, Gillies does not contest that he received the notice. Gillies's argument fails to raise a material issue.

Next, Gillies argues that the notice of default he received is not a true copy of the notice recorded by the trustee. Gillies points out: the space for the recorder's use is missing from his copy; the fist line on page 2 of the notice is justified on the left in the original and in the center on the copy; lines in the third and fourth paragraph on page two begin and end with different words in the original and copy; different fonts for the date and name of CRC are used in the original and copy; and the name and title of Stacy White are missing from the copy.

What Gillies fails to point out is any significant difference in the substance of the text of the notice. A copy does not necessarily mean a photocopy. If the text is substantially the same in the copy as the original, it qualifies as a copy.

Finally, Gillies questions whether Congress or the FDIC has the power to grant Chase the assets of Washington Mutual Bank while absolving Chase of all of Washington Mutual Bank's liabilities. Suffice it to say that Gillies cites no authority giving him standing to challenge an agreement between the FDIC and Chase.

7

Exhibit C- Pg. 37

The judgment is affirmed.  Costs on appeal are awarded to respondents.

<u>NOT TO BE PUBLISHED.</u>


GILBERT, P.J.

We concur:


COFFEE, J.


PERREN, J.

8

Exhibit C- Pg. 38

1  DOUGLAS GILLIES
2  3756 Torino Drive
   Santa Barbara, CA 93105
3  (805) 682-7033
4  douglasgillies@gmail.com
   *in pro per*
5



FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SANTA BARBARA

JUL 1 3 2011

GARY M. BLAIR, Executive Officer
BY _Joseph Garnica_
JOSEPH GARNICA, Deputy Clerk

6

7

8            **SUPERIOR COURT, STATE OF CALIFORNIA**

9                **COUNTY OF SANTA BARBARA**

10

11 DOUGLAS GILLIES,                  )   Case No.    **1381828**
                                     )
12                  Plaintiff,       )
                                     )
13            v.                     )   **Complaint for Declaratory**
                                     )   **Relief, Fraudulent Transfer,**
14 CALIFORNIA RECONVEYANCE CO.,      )   **Violation of Civ Code §2923.5,**
                                     )   **to Enjoin Illegal Foreclosure,**
15 and DOES 1-50                     )   **and for Damages**
                                     )
16                  Defendants.      )
                                     )
17                                   )
18 _____

19 Plaintiff alleges:

20                       **INTRODUCTION**

21     1. Plaintiff DOUGLAS GILLIES is a resident of Santa Barbara, California.

22     2. Defendant CALIFORNIA RECONVEYANCE COMPANY ("CRC") is a

23 California corporation.

24     3. Defendants Does 1-50, inclusive, are sued under fictitious names. When

25 their true names and capacities are known, Plaintiff will amend this Complaint

26 and insert them. Plaintiff is informed and believes and thereon alleges that each

27 of these fictitiously named defendants is legally responsible, negligently or in

28 some other actionable manner, for the events and happenings hereinafter

referred to and proximately caused the injuries and damages to plaintiff as hereinafter alleged, or claims some right, title, estate, lien, or interest in the residence adverse to Plaintiff's title and their claims constitute a cloud on Plaintiff's title to the property, or participated in unlawful or fraudulent acts that resulted in injury to Plaintiff's person or property.

4. Plaintiff brings this action against CRC and Does 1 through 50 for attempting to sell Plaintiff's Property at a trustee's sale and deprive Plaintiff of his residence without a lawful claim to the Property. Plaintiff seeks to clear his title of defendants' adverse claims.

5. Plaintiff DOUGLAS GILLIES is the rightful owner of a single-family residence at 3756 Torino Drive, Santa Barbara, California, APN 049-111-04-00 ("the Property"). He and his wife acquired the Property pursuant to a Grant Deed recorded on April 30, 1992, attached as Exhibit "A". The legal description of the Property is:

Lot 70 of Hidden Valley, in the City of Santa Barbara, County of Santa Barbara, State of California, as per map recorded in Book 52, Pages 26 to 32, inclusive of maps, in the office of the County Recorder of said County.

6. Plaintiff's wife conveyed her interest in the Property to Plaintiff by Interspousal Transfer Deed on July 16, 1997.

7. On August 13, 2009, defendant CRC recorded a Notice of Default ("NOD") alleging a breach of the obligation secured by a Deed of Trust for the Property. A copy of the NOD is attached as Exhibit "B". A search of the Santa Barbara County Grantor/Grantee Index under Plaintiff's name, Douglas Gillies, does not turn up any reference to the NOD.

8. On June 30, 2011, CRC recorded a Notice of Trustee's Sale (NOTS) that includes a legal description of part of the Property described in the Grant Deed. The NOTS describes CRC as "the duly appointed Trustee under and pursuant to Deed of Trust Recorded 08-27-2003, Book  , Page  , Instrument 2003-0116698 of

official records in the office of the recorder of SANTA BARBARA County, California, executed by: DOUGLES GILLIES, AN UNMARRIED MAN, as Trustor, WASHINGTON MUTUAL BANK, FA, as Beneficiary." A copy of the NOTS is attached as Exhibit "C".

9. CRC's statement in the NOTS that a Deed of Trust was executed by Dougles Gillies is false.

10. A Google search of the phrase "Dougles Gillies" reveals that Dougles Gillies is a fictitious name. No human being, business entity, or trademark in the Google universe bears the name *Dougles Gillies*. By comparison, any number of people are named Douglas Gillies but only one of them, Plaintiff, is named as Grantee on the Grant Deed (Exhibit A) to the Property.

11. No Deed of Trust recorded 08-27-2003 is listed in the Santa Barbara Grantor/Grantee Index under "Douglas Gillies." No Deed of Trust indexed under "Douglas Gillies" identifies CRC as a Trustee of the Property or Washington Mutual Bank, FA ("WaMu") as a Beneficiary. No Notice of Default and no Notice of Trustee's Sale are listed in the Santa Barbara Grantor/Grantee Index under "Douglas Gillies."

12. The NOTS states that CRC, as Trustee, will sell the Property at public auction sale on 7-25-2011 at 1:00 PM at the Santa Barbara County Courthouse.

**FIRST CAUSE OF ACTION – DECLARATORY RELIEF**

13. Plaintiff refers to and incorporates Paragraphs 1-12.

14. California Civil Code §2924f (b)(1) states, "before any sale of property can be made under the power of sale contained in any deed of trust or mortgage...notice of the sale thereof shall be given by posting a written notice...describing the property to be sold, at least 20 days before the date of sale...and publishing a copy once a week for three consecutive calendar weeks,

the first publication to be at least 20 days before the date of sale...The notice of
sale shall contain...the name of the original trustor".

15.  On July 6, 2011, Plaintiff searched his name, Douglas Gillies, in the
Grantor/Grantee Index of the Santa Barbara County Recorders' Office[1] for the
period between April 30, 1992, when Plaintiff acquired the Property, and July 5,
2011.

16.  There is no reference under Plaintiff's name in the Grantor/Grantee
Index of the Santa Barbara County Recorders' Office to the "Deed of Trust
Recorded 08-27-2003" which CRC describes in the NOTS. There is also no
reference in the Grantor/Grantee Index to the NOTS that CRC recorded on June
30, 2011.

17.  The only reference to Washington Mutual Bank in the Grantor/Grantee
index under Douglas Gillies is a Deed of Trust dated 2/14/2002, Record # 2002-
0014892. The Grantor/Grantee index indicates that that Deed of Trust was
reconveyed to Plaintiff on 9/30/2003, Record # 2003-0133943.

18.  The only index maintained by the Santa Barbara Recorder for the
purpose of searching title to real property is the Grantor/Grantee Index, and if
the name of a property owner is not spelled correctly in a recorded document,
that document will not turn up in a title search.

19.  An actual controversy has arisen and now exists between Plaintiff and
Defendants concerning their respective rights and duties. Plaintiff contends that
Defendants are not authorized to publish, post, serve, or record a Notice of
Trustee's Sale and are not entitled to sell the Property on the grounds that CRC is
not a Trustee, Washington Mutual is not a Beneficiary of Record, and no Notice
of Trustee's Sale has been recorded stating the name of the owner of the Property,

---

[1] http://www.sbcvote.com/clerkrecorder/GrantorGranteeIndex.aspx

1   whereas CRC asserts that it will sell the residence at the Santa Barbara
2   Courthouse on July 25, 2011, at 1:00 PM.
3       20. Plaintiff respectfully requests an order that the Deed of Trust through
4   which the Defendants claim title to and/or the right to sell the Property at 3756
5   Torino Drive, and the attached NOD and NOTS be declared invalid and void.
6
7       **SECOND CAUSE OF ACTION – FRAUDULENT TRANSFER**
8       21. Plaintiff refers to and incorporates Paragraphs 1-20.
9       22. On or about March 9, 2010, Plaintiff informed CRC that the NOD it
10  recorded August 13, 2009, did not correctly state the name of the trustor, that it
11  incorrectly stated the name of the trustor to be *Dougles Gillies*, a fictitious
12  person, that a search of the Santa Barbara Official Records for Douglas Gillies did
13  not turn up any NOD recorded by CRC, and that the NOD did not comply with
14  Cal. Civil Code §2924 because a notice of default must be recorded prior to a
15  nonjudicial sale stating the name of the trustor.
16      23. Knowing that the name on the NOD, *Dougles Gillies,* is fictitious, CRC
17  recorded a NOTS on June 30, 2011 stating that name, delivered a copy to Plaintiff
18  announcing its intention to conduct a Trustee's Sale on July 25, 2011, and
19  published the NOTS in a newspaper of general circulation falsely representing
20  that CRC is the duly appointed Trustee pursuant to Deed of Trust Recorded 08-
21  27-2003 executed by "DOUGLES GILLIES AN UNMARRIED MAN, as Trustor".
22      24. For many years, CRC has been in the business of conducting trustee's
23  sales in California, and therefore CRC knew or should have known that a DOT,
24  NOD, or NOTS recorded under a fictitious name cannot be located in a title
25  search of the Property in the Santa Barbara Grantor/Grantee Index.
26      25. If not restrained by the Court, CRC may attempt to fraudulently sell
27  defective title to the Property to an unsuspecting buyer at a trustee's sale at the
28  Santa Barbara courthouse, and as a result will intentionally place a cloud on the

Complaint for Declaratory Relief, Fraudulent Transfer, Violation of §2923.5, and Enjoin Illegal Foreclosure

Exhibit D- Pg. 43

1  title to Plaintiff's Property that will require a succession of lawsuits and impose
2  on Plaintiff the financial burden of tendering a sum of several hundred thousand
3  dollars and hiring attorneys to quiet title to his Property against any "bona fide"
4  purchaser who relies upon CRC's misrepresentations.

5

6  **THIRD CAUSE OF ACTION – VIOLATION OF CIV. CODE §2923.5**

7      26.  Plaintiff refers to and incorporates Paragraphs 1 - 25.

8      27.  The Notice of Default (Exhibit B) does not name the beneficiary or an
9  authorized agent. It simply states, "To find out the amount you must pay, to
10 arrange for payment to stop the foreclosure, or if the property is in foreclosure for
11 any other reason, contact: JPMorgan Chase Bank, National Association at 7301
12 Baymeadows Way, Jacksonville, FL 32256." JPMorgan Chase Bank's capacity is
13 not described in the Notice of Default.

14     28.  California Civil Code §2923.5 states that a Notice of Default may not be
15 filed until 30 days after a mortgagee, a beneficiary, or an authorized agent has
16 contacted the borrower, accessed the borrower's financial situation, and explored
17 options to avoid foreclosure. The Notice of Default must include a declaration
18 from one of those three entities showing that it has contacted the borrower or
19 tried with due diligence to contact the borrower.

20     29.  The Notice of Default (Ex. B) does not include a declaration under oath
21 from a mortgagee, beneficiary, or authorized agent stating that the contacts
22 required by §2923.5 have taken place exploring options to avoid foreclosure.
23 Rather, the Notice of Default states, "The beneficiary or its designated agent
24 declares that it has contacted the borrower...." This ambiguous assertion does not
25 have any evidentiary value to indicate who contacted the borrower or whether
26 options were explored.

27     30. Defendants did not contact Plaintiff, either in person or by telephone,
28 to discuss Plaintiff's financial condition and the impending foreclosure.

Complaint for Declaratory Relief, Fraudulent Transfer, Violation of §2923.5, and Enjoin Illegal Foreclosure

Exhibit D- Pg. 44

Defendants did not call, it did not write, and it did not provide a toll-free HUD number to Plaintiff. Defendants did not offer to meet with Plaintiff and did not advise him that he had a right to request a subsequent meeting within 14 days.

31. California Civil Code §2923.5(g) states that a notice of default may be filed pursuant to §2924 when a mortgagee, beneficiary, or authorized agent has not contacted a borrower provided that the failure to contact the borrower occurred despite the due diligence of the mortgagee, beneficiary, or authorized agent.  Due diligence is defined in §2923.5(g) as:

(1) A mortgagee, beneficiary, or authorized agent shall first attempt to contact a borrower by sending a first-class letter that includes the toll-free telephone number made available by HUD to find a HUD-certified housing counseling agency.

(2) (A) After the letter has been sent, the mortgagee, beneficiary, or authorized agent shall attempt to contact the borrower by telephone at least three times at different hours and on different days.  Telephone calls shall be made to the primary telephone number on file.

(B) A mortgagee, beneficiary, or authorized agent may attempt to contact a borrower using an automated system to dial borrowers, provided that, if the telephone call is answered, the call is connected to a live representative of the mortgagee, beneficiary, or authorized agent.

(C) A mortgagee, beneficiary, or authorized agent satisfies the telephone contact requirements of this paragraph if it determines, after attempting contact pursuant to this paragraph, that the borrower's primary telephone number and secondary telephone number or numbers on file, if any, have been disconnected.

(3) If the borrower does not respond within two weeks after the telephone call requirements of paragraph (2) have been satisfied, the mortgagee, beneficiary, or authorized agent shall then send a certified letter, with return receipt requested.

(4) The mortgagee, beneficiary, or authorized agent shall provide a means for the borrower to contact it in a timely manner, including a toll-free telephone number that will provide access to a live representative during business hours.

(5) The mortgagee, beneficiary, or authorized agent has posted a prominent link on the homepage of its Internet Web site, if any, to the following information:

(A) Options that may be available to borrowers who are unable to afford their mortgage payments and who wish to avoid foreclosure, and instructions to borrowers advising them on steps to take to explore those options.

(B) A list of financial documents borrowers should collect and be prepared to present to the mortgagee, beneficiary, or authorized agent when discussing options for avoiding foreclosure.

(C) A toll-free telephone number for borrowers who wish to discuss options for avoiding foreclosure with their mortgagee, beneficiary, or authorized agent.

(D) The toll-free telephone number made available by HUD to find a HUD-certified housing counseling agency.

32. Defendants did none of the above. The Notice of Default identifies CRC as "duly appointed Trustee under a Deed of Trust dated 08/12/2003, executed by DOUGLES GILLIES, AN UNMARRIED MAN, as trustor to secure obligations in favor of WASHINGTON MUTUAL BANK, FA, as Beneficiary Recorded 8/27/2003, Book , Page , ". It directs the recipient to contact JPMorgan Chase Bank, National Association, in Jacksonville, FL to stop the foreclosure.

33. The final paragraph of the NOD states, "The beneficiary or its designated agent declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code 2923.5, or the borrower has surrendered the property to the beneficiary or authorized agent, or is otherwise exempt from the requirements of §2923.5. It is signed by Stacy White, Assistant Secretary.

34. Stacy White either misrepresented the facts, if and when she signed the NOD, or she did not have personal knowledge of the matters described in her statement when she asserted that "the beneficiary or its designated agent" tried to contact Plaintiff as required by §2923.5.

35. Since the contacts required by §2923.5 did not occur, the foreclosure is illegal.

Exhibit D- Pg. 46

36.  An actual controversy has arisen and now exists between plaintiff and defendants concerning their respective rights and duties. Plaintiff contends that defendants are not entitled to sell the residence because no beneficiary or authorized agent complied with the requirements of Civil Code §2923.5 to contact the borrower to explore options to foreclosure, whereas defendants assert that they will sell the residence on July 25, 2011.

### FOURTH CAUSE OF ACTION – INJUNCTION

37.  Plaintiff refers to and incorporates Paragraphs 1-36.

38.  Unless restrained, defendants will sell plaintiff's residence, or cause it to be sold, to plaintiff's great and irreparable injury, for which pecuniary compensation would not afford adequate relief.

39.  Defendants' wrongful conduct, unless and until restrained by order of this court, will cause great irreparable injury to plaintiff as the value of the residence declines under threat of foreclosure and plaintiff faces the prospect of eviction from his residence.

40.  Plaintiff has no adequate remedy at law for the injuries currently being suffered and that are threatened. It will be impossible for plaintiff to determine the precise amount of damage that he will suffer if defendants' conduct is not restrained and plaintiff is forced to institute a multiplicity of suits to remain in possession, quiet title, and obtain compensation for his injuries.

41.  As a proximate result of defendants' wrongful conduct, plaintiff has been damaged in excess of $100,000.00 due to a decline in the value of the Property. Plaintiff will be further damaged so long as defendants' efforts to conduct an unauthorized sale continue. The full amount of this damage is not now known to plaintiff, and plaintiff will amend this complaint to state the amount when it becomes known.

Complaint for Declaratory Relief, Fraudulent Transfer, Violation of §2923.5, and Enjoin Illegal Foreclosure

Exhibit D- Pg. 47

WHEREFORE, plaintiff prays judgment against defendants as follows:

1. For a declaration that the Deed of Trust through which the Defendants claim title to and/or the right to sell the Property at 3756 Torino Drive, the attached NOD (Exhibit B), and attached NOTS (Exhibit C) be declared invalid and void.

2. For a temporary restraining order, a preliminary injunction, and a permanent injunction, enjoining defendants, and all persons acting under, for, or in concert with defendants from selling the residence or attempting to sell it or causing it to be sold, either under power of sale pursuant to the trust deed or by foreclosure action, and from posting, publishing, or recording a notice of default or notice of trustee's sale contrary to state or federal law;

3. For an order requiring defendants to show cause why they should not be enjoined from selling the residence during the pendency of this action;

4. For damages in the sum of $100,000.00, plus damages in such further sums as may be sustained and ascertained before final judgment;

5. For reasonable attorney's fees and costs of suit incurred; and

6. For other relief as the court deems proper.

July 13, 2011

Douglas Gillies, Plaintiff

VERIFICATION

I, Douglas Gillies, am the plaintiff in the above-entitled action. I have read the foregoing complaint and know its contents. The same is true of my own knowledge, except as to those matters that are alleged on information and belief, and as to those matters, I believe them to be true. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

July 13, 2011

Complaint for Declaratory Relief, Fraudulent Transfer, Violation of §2923.5, and Enjoin Illegal Foreclosure

- 10 -

Exhibit D- Pg. 48

# Plaintiff's Exhibits

| Exhibit | Description | Recorded |
|---|---|---|
| 1 | Grant Deed | 4/30/1992 |
| 2 | Notice of Default | 8/13/2009 |
| 3 | Notice of Trustee's Sale | 6/30/2011 |

Exhibit D- Pg. 49

# EXHIBIT 1

RECORDING REQUESTED BY

EQUITY TITLE COMPANY

AND WHEN RECORDED MAIL THIS DEED AND, UNLESS OTHERWISE SHOWN BELOW,
MAIL TAX STATEMENTS TO:

NAME    DOUGLAS GILLIES
ADDRESS LINDA GILLIES
CITY &   3756 TORINO DRIVE
STATE
ZIP     SANTA BARBARA, CA  93105

Title Order No. 92-32968  Escrow No. 32968-LN

92-032131

| | | Rec Fee | 5.00 |
|---|---|---|---|
| | | DOC | 348.70 |
| Recorded | | Total | 353.70 |

Official Records
County of
Santa Barbara
Kenneth A Pettit
Recorder
8:00am 30-Apr-92    ETCO   BC   1

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# GRANT DEED

APN NO. 049-111-04

MONUMENT SURVEY EXEMPT

The undersigned declares that the documentary transfer tax is $ 348.70 _____ city tax $ _____ and is
XXX computed on the full value of the interest or property conveyed, or is
☐ computed on the full value less the value of liens or encumbrances remaining thereon at the time of sale. The land, tenements or
realty is located in
☐ unincorporated area XXX city of  SANTA BARBARA _____

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

JOAN R. LANDECKER, AN UNMARRIED WOMAN

hereby GRANT(S) to  DOUGLAS GILLIES AND LINDA GILLIES, HUSBAND AND WIFE, AS COMMUNITY
PROPERTY

the following described real property in the    CITY OF SANTA BARBARA
county of    SANTA BARBARA                         , state of California:

LOT 70 OF HIDDEN VALLEY, IN THE CITY OF SANTA BARBARA, COUNTY OF SANTA BARBARA,
STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 52, PAGES 26 TO 32, INCLUSIVE,
OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Dated    MARCH 27, 1992 _____

STATE OF CALIFORNIA
COUNTY OF  Placer _____

On this the  7  day of  Apr  19 92 , before me,
Beverly L Rosellini, the undersigned Notary Public,
personally appeared  Joan R. Landecker

☐ personally known to me
☒ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s)  is  subscribed to the within
instrument and acknowledged to me that  She  executed the same
in  her  authorized capacity(ies) and that by  her  signature(s)
on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

Beverly L Rosellini
Notary's Signature

_Joan R Landecker_
JOAN R. LANDECKER

_____
_____
_____
_____

FOR NOTARY SEAL OR STAMP

OFFICIAL SEAL
BEVERLY L. ROSELLINI
NOTARY PUBLIC - CALIFORNIA
PLACER COUNTY
My Comm. Expires Feb. 19, 1993

MAIL TAX STATEMENTS TO PARTY SHOWN ON FOLLOWING LINE: IF NO PARTY SO SHOWN, MAIL AS DIRECTED ABOVE

Name _____  Street Address _____  City & State _____

ET-137  (Rev. 6-91)        **Plaintiff's Exhibit 1    Page 1 of 1**

Exhibit D- Pg. 51

# EXHIBIT 2

requested by title court

2009-0049697

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA 91311
800 892-6902
(818)775-2258 (Fax)

| Recorded | REC FEE | 14.00 |
| Official Records | | |
| County of | | |
| Santa Barbara | | |
| Joseph E. Holland | | |
| | LC | |
| 08:00AM 13-Aug-2009 | Page 1 of 2 | |

Space above this line for recorder's use only

Trustee Sale No. 237917CA   Loan No. 0081173676   Title Order No. 184926

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $10,367.71 as of August 12, 2009 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of property by paying the entire amount demanded by your creditor.

Plaintiff's Exhibit 2   Page 1 of 2

Exhibit D- Pg. 53

Trustee Sale No. 237917CA   Loan No. 0081173676   Title Order No. 184926

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: JPMorgan Chase Bank, National Association, at 7301 BAYMEADOWS WAY , JACKSONVILLE, FL 32256, (877) 926-8937.

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.  NOTICE IS HEREBY GIVEN THAT: CALIFORNIA RECONVEYANCE COMPANY is the duly appointed Trustee under a Deed of Trust dated 08/12/2003, executed by DOUGLES GILLIES, AN UNMARRIED MAN, as trustor, to secure obligations in favor of WASHINGTON MUTUAL BANK, FA, as Beneficiary Recorded 08/27/2003, Book , Page , Instrument 2003-0116698 of official records in the Office of the Recorder of SANTA BARBARA County, California, as more fully described on said Deed of Trust. APN: 049-111-04-00 Situs: 3756 TORINO DRIVE , , SANTA BARBARA, CA 93105 Including the note(s) for the sum of $500,000.00 that the beneficial interest under said Deed of Trust and the obligations secured thereby are presently held by the beneficiary; that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the payment has not been made of: THE 05/01/2009 INSTALLMENT OF PRINCIPAL AND INTEREST AND ALL SUBSEQUENT MONTHLY INSTALLMENTS OF PRINCIPAL AND INTEREST; PLUS ANY ADDITIONAL ACCRUED AND UNPAID AMOUNTS INCLUDING, BUT NOT LIMITED TO, LATE CHARGES, ADVANCES, IMPOUNDS, TAXES, HAZARD INSURANCE, ADMINISTRATIVE FEES, INSUFFICIENT AND PARTIAL RETURN CHECK FEES, STATEMENT FEES, AND OBLIGATIONS SECURED BY PRIOR ENCUMBRANCES.

That by reason thereof, the present beneficiary under such Deed of Trust, has executed and delivered to said Trustee, a written Declaration and Demand for Sale, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing the obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The beneficiary or its designated agent declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code 2923.5, or the borrower has surrendered the property to the beneficiary or authorized agent, or is otherwise exempt from the requirements of §2923.5.

DATE: August 12, 2009

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

STACY WHITE, Assistant Secretary

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

# EXHIBIT 3

Recording Requested By **Requested By**
ServiceLink **Title Court Service**

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA 91311
800-892-6902

| Trustee Sale No. | 237917CA |
| Loan No. | 0081173676 |
| Title Order No. | 184926 |

**2011-0037798**

```
          Recorded        | REC FEE       21.00
       Official Records   |
          County of       |
        Santa Barbara     |
      Joseph E. Holland   |
   County Clerk Recorder  |
                          |
                          | ML
    08:00AM 30-Jun-2011   | Page 1 of 2
```

Space above this line for recorder's use only

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 08-12-2003. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On 07-25-2011 at 01:00 PM, CALIFORNIA RECONVEYANCE COMPANY as the duly appointed Trustee under and pursuant to Deed of Trust Recorded 08-27-2003, Book , Page , Instrument 2003-0116698,   of official records in the Office of the Recorder of SANTA BARBARA County, California, executed by:  DOUGLES GILLIES, AN UNMARRIED MAN, as Trustor, WASHINGTON MUTUAL BANK, FA, as Beneficiary, will sell at public auction sale to the highest bidder for cash, cashier's check drawn by a state or national bank, a cashier's check drawn by a state or federal credit union, or a cashier's check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state.  Sale will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to the Deed of Trust.  The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, interest thereon, estimated fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below.  The amount may be greater on the day of sale.

Place of Sale: AT THE MAIN ENTRANCE TO THE COUNTY COURTHOUSE, 1100 ANACAPA STREET , SANTA BARBARA, CA

Legal Description:  LOT 70 OF HIDDEN VALLEY, IN THE CITY OF SANTA BARBARA, COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 52 PAGES 26 TO 32, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND, BUT WITHOUT THE RIGHT OF ENTRY ONTO THE SURFACE OR THAT PORTION OF SUBSURFACE OF SAID LAND LYING ABOVE A DEPTH OF 500 FEET BELOW THE SURFACE THEREOF.

Amount of unpaid balance and other charges: $546,411.40 (estimated)

Street address and other common designation of the real property:     3756 TORINO DRIVE
SANTA BARBARA, CA 93105
APN Number:   049-111-04-00

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. The property heretofore described is being sold "as is".

**Plaintiff's Exhibit 3    Page 1 of 2**

Exhibit D- Pg. 56

In compliance with California Civil Code 2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their financial situation and to explore options to avoid foreclosure by one of the following methods: by telephone; by United States mail; either 1st class or certified; by overnight delivery; by personal delivery; by e-mail; by face to face meeting.

DATE: 06-28-2011

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

CASEY KEALOHA, ASSISTANT SECRETARY

California Reconveyance Company
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA  91311
800-892-6902

For Sales Information:
(714) 730-2727 or www.lpsasap.com
(714) 573-1965 or www.priorityposting.com

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT
COLLECTOR ATTEMPTING TO COLLECT A DEBT.  ANY
INFORMATION OBTAINED WILL BE USED FOR THAT

**Plaintiff's Exhibit 3    Page 2 of 2**

Exhibit D- Pg. 57

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| DOUGLAS GILLIES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA RECONVEYANCE CO.,<br><br>Defendant and Respondent. | 2d Civil No. B237562<br>(Super. Ct. No. 1381828)<br>(Santa Barbara County)<br><br>COURT OF APPEAL - SECOND DIST<br>**F I L E D**<br><br>SEP 6 2012<br><br>JOSEPH A. LANE, Clerk |

This is the second action brought by Douglas Gillies in an attempt to prevent foreclosure of a trust deed on his home. The trial court concluded the present action is barred by the doctrine of res judicata. We affirm.

FACTS

*Gillies I*

In his first action, Gillies complained that the notice of default did not contain a sufficient declaration that the mortgagee, beneficiary or authorized agent contacted the borrower 30 days prior to filing the notice, as required by Civil Code section 2923.5, subdivision (b). Gillies also complained that the lender violated former Civil Code section 2923.52 by prematurely giving notice of sale.

The trial court sustained California Reconveyance Company's demurrer without leave to amend. Gillies appealed and we affirmed. (*Gillies v. California Reconveyance Co. et al.* (Apr. 11, 2011) B224995 [nonpub. opn.]; hereafter *Gillies I.*) In affirming, we considered additional issues raised in Gillies's brief, including that the notice of default misspelled his first name.

*Gillies II*

In the instant action, Gillies again complains that his first name was spelled on foreclosure documents with an "e" instead of an "a," thus preventing proper indexing by the County Recorder.

He also reiterates his contention that the notice of default does not comply with Civil Code section 2923.5. This time he adds that he was never contacted by anyone to assess his financial situation and explore options to avoid foreclosure.

California Reconveyance Company moved to strike the complaint as barred under the doctrine of res judicata. It requested that the court take judicial notice of *Gillies I.* The trial court was unsure whether a motion to strike or demurrer is the proper procedure. It granted the motion to strike stating that to the extent the issues are more properly addressed by demurrer, the motion is deemed a demurrer.

DISCUSSION

I

In reviewing the sustaining of a demurrer, we accept as true all of the complaint's allegations of material facts. (*Al Holding Co. v. O'Brien & Hicks, Inc.* (1999) 75 Cal.App.4th 1310, 1312.) But we do not accept as true contentions, deductions or conclusions of fact or law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) We also read the complaint as though it included matters of which the trial court has properly taken judicial notice. (Code

2

Civ. Proc., § 430.30, subd. (a).)  If it appears the plaintiff is entitled to any relief,
the complaint will be held good.  (*Chase Chemical Co. v. Hartford Acc. & Indemn.
Co.* (1984) 159 Cal.App.3d 229, 242.)

Our task in reviewing the grant of a motion to strike is the same.  We
review the face of the complaint and matters of which the court took judicial notice
to determine whether the complaint is drawn in conformity with the law.  (Code
Civ. Proc., §§ 436, 437.)

II

The doctrine of res judicata gives conclusive effect to a former
judgment in subsequent litigation involving the same controversy.  (7 Witkin, Cal.
Procedure (5th ed. 2008) Judgment, § 334, p. 938.)  In order for the doctrine to
apply, the prior judgment must be final and rendered on the merits.  (*Goddard v.
Security Title Ins. & Guar. Co.* (1939) 14 Cal.2d 47, 51.)  Our opinion in *Gillies I*
was filed on April 11, 2011, and has long since become final.

Gillies points out that the judgment in *Gillies I* arose from the
sustaining of a demurrer.  He argues that the doctrine does not apply where the prior
judgment arose from a demurrer.  But the doctrine applies where a general demurrer
was sustained on the merits of the prior action.  (*Ojavan Investors, Inc. v. California
Coastal Com.* (1997) 54 Cal.App.4th 373, 383-384.)  Here the demurrer in *Gillies I*
was a general demurrer sustained on the merits.

Gillies argues the instant action is not barred by *Gillies I* because the
instant action alleges different issues.  He claims the instant action alleges a
different violation of Civil Code section 2923.5 and that the trust deed and notice of
default were not indexed properly.  But res judicata bars re-litigation of not only
claims that were determined in the prior action, but claims that could have been
raised in the prior action.  (*Ojavan Investors, Inc. v. California Coastal Com.*,

3

*supra*, 54 Cal.App.4th at p. 384.) Here there is no reason why Gillies could not have raised the new issues in *Gillies I*.

The judgment is affirmed. Costs are awarded to respondent.

NOT TO BE PUBLISHED.

GILBERT, P.J.

We concur:

YEGAN, J.

PERREN, J.

4

Exhibit E- Pg. 61

# PURCHASE AND ASSUMPTION AGREEMENT

## WHOLE BANK

### AMONG

**FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF WASHINGTON MUTUAL BANK,
HENDERSON, NEVADA**

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**and**

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**

**DATED AS OF**

**SEPTEMBER 25, 2008**

# TABLE OF CONTENTS

**ARTICLE I**     **DEFINITIONS** .................................................................2

**ARTICLE II**    **ASSUMPTION OF LIABILITIES**.......................................8

    2.1     Liabilities Assumed by Assuming Bank ..............................8
    2.2     Interest on Deposit Liabilities ............................................8
    2.3     Unclaimed Deposits ...........................................................8
    2.4     Omitted ...............................................................................9
    2.5     Borrower Claims ................................................................9

**ARTICLE III**   **PURCHASE OF ASSETS** ...................................................9

    3.1     Assets Purchased by Assuming Bank ................................9
    3.2     Asset Purchase Price..........................................................9
    3.3     Manner of Conveyance; Limited Warranty;
             Nonrecourse; Etc..........................................................10
    3.4     Puts of Assets to the Receiver.........................................10
    3.5     Assets Not Purchased by Assuming Bank .......................11
    3.6     Assets Essential to Receiver ............................................11

**ARTICLE IV**   **ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS**........13

    4.1     Continuation of Banking Business....................................13
    4.2     Agreement with Respect to Credit Card Business ...........13
    4.3     Agreement with Respect to Safe Deposit Business ..........13
    4.4     Agreement with Respect to Safekeeping Business ...........13
    4.5     Agreement with Respect to Trust Business ......................13
    4.6     Agreement with Respect to Bank Premises ......................14
    4.7     Agreement with Respect to Leased Data
             Processing Equipment...................................................16
    4.8     Agreement with Respect to Certain
             Existing Agreements.....................................................16
    4.9     Informational Tax Reporting ............................................17
    4.10    Insurance ..........................................................................17
    4.11    Office Space for Receiver and Corporation.....................17
    4.12    Omitted .............................................................................18
    4.13    Omitted .............................................................................18

ii

| | | |
|---|---|---|
| **ARTICLE V** | **DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK** .................................................. **18** |
| 5.1 | Payment of Checks, Drafts and Orders ..................... 18 |
| 5.2 | Certain Agreements Related to Deposits ................... 18 |
| 5.3 | Notice to Depositors ............................................ 18 |
| **ARTICLE VI** | **RECORDS** ........................................................ **19** |
| 6.1 | Transfer of Records............................................ 19 |
| 6.2 | Delivery of Assigned Records .............................. 20 |
| 6.3 | Preservation of Records ..................................... 20 |
| 6.4 | Access to Records; Copies................................... 20 |
| **ARTICLE VII** | **BID; INITIAL PAYMENT** ................................... **20** |
| **ARTICLE VIII** | **PROFORMA** .................................................... **20** |
| **ARTICLE IX** | **CONTINUING COOPERATION** ......................... **21** |
| 9.1 | General Matters................................................ 21 |
| 9.2 | Additional Title Documents................................ 21 |
| 9.3 | Claims and Suits .............................................. 21 |
| 9.4 | Payment of Deposits ......................................... 22 |
| 9.5 | Withheld Payments .......................................... 22 |
| 9.6 | Proceedings with Respect to Certain Assets and Liabilities............................................. 22 |
| 9.7 | Information...................................................... 23 |
| **ARTICLE X** | **CONDITION PRECEDENT** ................................ **23** |
| **ARTICLE XI** | **REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK** .......................................... **23** |
| **ARTICLE XII** | **INDEMNIFICATION** ......................................... **24** |
| 12.1 | Indemnification of Indemnitees ........................... 25 |
| 12.2 | Conditions Precedent to Indemnification.............. 27 |
| 12.3 | No Additional Warranty..................................... 28 |
| 12.4 | Indemnification of Corporation and Receiver.......... 29 |
| 12.5 | Obligations Supplemental................................... 29 |
| 12.6 | Criminal Claims.............................................. 29 |
| 12.7 | Limited Guaranty of the Corporation.................... 29 |
| 12.8 | Subrogation .................................................... 30 |

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

Exhibit F- Pg. 64

**ARTICLE XIII**    **MISCELLANEOUS** ......................................................................30

    13.1    Entire Agreement ........................................................................30
    13.2    Headings ...................................................................................30
    13.3    Counterparts ..............................................................................30
    13.4    Governing Law ...........................................................................30
    13.5    Successors .................................................................................30
    13.6    Modification; Assignment ..........................................................31
    13.7    Notice .......................................................................................31
    13.8    Manner of Payment....................................................................31
    13.9    Costs, Fees and Expenses ..........................................................32
    13.10   Waiver.......................................................................................32
    13.11   Severability ...............................................................................32
    13.12   Term of Agreement....................................................................32
    13.13   Survival of Covenants, Etc. .......................................................32

**SCHEDULES**

    2.1     Certain Liabilities Not Assumed................................................34
    3.2     Purchase Price of Assets or Assets ...........................................35
    3.5     Certain Assets Not Purchased...................................................37

**EXHIBIT**

    3.2(c)   Valuation of Certain Qualified Financial Contracts ...................38

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

Exhibit F- Pg. 65

## PURCHASE AND ASSUMPTION AGREEMENT

## WHOLE BANK

**THIS AGREEMENT**, made and entered into as of the 25th day of September, 2008, by and among the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of WASHINGTON MUTUAL BANK, HENDERSON, NEVADA** (the "Receiver"), **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, organized under the laws of the United States of America, and having its principal place of business in Seattle, Washington (the "Assuming Bank"), and the **FEDERAL DEPOSIT INSURANCE CORPORATION**, organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity (the "Corporation").

### WITNESSETH:

**WHEREAS**, on Bank Closing, the Chartering Authority closed Washington Mutual Bank (the "Failed Bank") pursuant to applicable law and the Corporation was appointed Receiver thereof; and

**WHEREAS**, the Assuming Bank desires to purchase substantially all of the assets and assume all deposit and substantially all other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement; and

**WHEREAS**, pursuant to 12 U.S.C. Section 1823(c)(2)(A), the Corporation may provide assistance to the Assuming Bank to facilitate the transactions contemplated by this Agreement, which assistance may include indemnification pursuant to Article XII; and

**WHEREAS**, the Board of Directors of the Corporation (the "Board") has determined to provide assistance to the Assuming Bank on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, the Board has determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that such assistance is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in the Failed Bank and is the least costly to the deposit insurance fund of all possible methods for meeting such obligation.

**NOW THEREFORE**, in consideration of the mutual promises herein set forth and other valuable consideration, the parties hereto agree as follows:

Exhibit F- Pg. 66

# ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I, or elsewhere in this Agreement. As used herein, words imparting the singular include the plural and vice versa.

"**Accounting Records**" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

"**Acquired Subsidiaries**" means Subsidiaries of the Failed Bank acquired pursuant to Section 3.1.

"**Adversely Classified**" means, with respect to any Loan or security, a Loan or security which has been designated in the most recent report of examination as "Substandard," "Doubtful" or "Loss" by the Failed Bank's appropriate Federal or State Chartering Authority or regulator.

"**Affiliate**" of any Person means any director, officer, or employee of that Person and any other Person (i) who is directly or indirectly controlling, or controlled by, or under direct or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the term "affiliate" is defined in Section 2 of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Section 1841.

"**Agreement**" means this Purchase and Assumption Agreement by and among the Assuming Bank, the Corporation and the Receiver, as amended or otherwise modified from time to time.

"**Assets**" means all assets of the Failed Bank purchased pursuant to Section 3.1. Assets owned by Subsidiaries of the Failed Bank are not "Assets" within the meaning of this definition.

"**Assumed Deposits**" means Deposits.

"**Bank Closing**" means the close of business of the Failed Bank on the date on which the Chartering Authority closed such institution.

"**Bank Premises**" means the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by the Failed Bank and that are occupied by the Failed Bank as of Bank Closing.

"**Bid Amount**" has the meaning provided in Article VII.

2

"**Book Value**" means, with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Accounting Records of the Failed Bank. The Book Value of any item shall be determined as of Bank Closing after adjustments made by the Assuming Bank for normal operational and timing differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary. The Book Value of a Subsidiary of the Failed Bank acquired by the Assuming Bank shall be determined from the investment in subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting. Without limiting the generality of the foregoing, (i) the Book Value of a Liability Assumed shall include all accrued and unpaid interest thereon as of Bank Closing, and (ii) the Book Value of a Loan shall reflect adjustments for earned interest, or unearned interest (as it relates to the "rule of 78s" or add-on-interest loans, as applicable), if any, as of Bank Closing, adjustments for the portion of earned or unearned loan-related credit life and/or disability insurance premiums, if any, attributable to the Failed Bank as of Bank Closing, and adjustments for Failed Bank Advances, if any, in each case as determined for financial reporting purposes. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of the Failed Bank.

"**Business Day**" means a day other than a Saturday, Sunday, Federal legal holiday or legal holiday under the laws of the State where the Failed Bank is located, or a day on which the principal office of the Corporation is closed.

"**Chartering Authority**" means (i) with respect to a national bank, the Office of the Comptroller of the Currency, (ii) with respect to a Federal savings association or savings bank, the Office of Thrift Supervision, (iii) with respect to a bank or savings institution chartered by a State, the agency of such State charged with primary responsibility for regulating and/or closing banks or savings institutions, as the case may be, (iv) the Corporation in accordance with 12 U.S.C. Section 1821(c), with regard to self appointment, or (v) the appropriate Federal banking agency in accordance with 12 U.S.C. 1821(c)(9).

"**Commitment**" means the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Bank to make an extension of credit (or additional advances with respect to a Loan) that was legally binding on the Failed Bank as of Bank Closing, other than extensions of credit pursuant to the credit card business and overdraft protection plans of the Failed Bank, if any.

"**Credit Documents**" mean the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, banker's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignments, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, participation agreements and intercreditor agreements, and all amendments, modifications, renewals, extensions, rearrangements, and substitutions with respect to any of the foregoing.

"**Credit File**" means all Credit Documents and all other credit, collateral, or insurance documents in the possession or custody of the Assuming Bank, or any of its Subsidiaries or Affiliates, relating to an Asset or a Loan included in a Put Notice, or copies of any thereof.

"**Data Processing Lease**" means any lease or licensing agreement, binding on the Failed Bank as of Bank Closing, the subject of which is data processing equipment or computer hardware or software used in connection with data processing activities. A lease or licensing agreement for computer software used in connection with data processing activities shall constitute a Data Processing Lease regardless of whether such lease or licensing agreement also covers data processing equipment.

"**Deposit**" means a deposit as defined in 12 U.S.C. Section 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

"**Failed Bank Advances**" means the total sums paid by the Failed Bank to (i) protect its lien position, (ii) pay ad valorem taxes and hazard insurance, and (iii) pay credit life insurance, accident and health insurance, and vendor's single interest insurance.

"**Fixtures**" means those leasehold improvements, additions, alterations and installations constituting all or a part of Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Bank, regardless of the holder of legal title thereto as of Bank Closing.

"**Furniture and Equipment**" means the furniture and equipment (other than leased data processing equipment, including hardware and software), leased or owned by the Failed Bank and reflected on the books of the Failed Bank as of Bank Closing, including without limitation automated teller machines, carpeting, furniture, office machinery (including personal computers), shelving, office supplies, telephone, surveillance and security systems, and artwork.

"**Indemnitees**" means, except as provided in paragraph (11) of Section 12.1(b), (i) the Assuming Bank, (ii) the Subsidiaries and Affiliates of the Assuming Bank other than any Subsidiaries or Affiliates of the Failed Bank that are or become Subsidiaries or Affiliates of the Assuming Bank, and (iii) the directors, officers, employees and agents of the Assuming Bank and its Subsidiaries and Affiliates who are not also present or former directors, officers, employees or agents of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank.

4

"**Initial Payment**" means the payment made pursuant to Article VII, the amount of which shall be either (i) if the Bid Amount is positive, the Bid Amount plus the Required Payment or (ii) if the Bid Amount is negative, the Required Payment minus the Bid Amount. The Initial Payment shall be payable by the Corporation to the Assuming Bank if the Initial Payment is a negative amount. The Initial Payment shall be payable by the Assuming Bank to the Corporation if the Initial Payment is positive.

"**Legal Balance**" means the amount of indebtedness legally owed by an Obligor with respect to a Loan, including principal and accrued and unpaid interest, late fees, attorneys' fees and expenses, taxes, insurance premiums, and similar charges, if any.

"**Liabilities Assumed**" has the meaning provided in Section 2.1.

"**Lien**" means any mortgage, lien, pledge, charge, assignment for security purposes, security interest, or encumbrance of any kind with respect to an Asset, including any conditional sale agreement or capital lease or other title retention agreement relating to such Asset.

"**Loans**" means all of the following owed to or held by the Failed Bank as of Bank Closing:

   (i)    loans (including loans which have been charged off the Accounting Records of the Failed Bank in whole or in part prior to Bank Closing), participation agreements, interests in participations, overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account), revolving commercial lines of credit, home equity lines of credit, Commitments, United States and/or State-guaranteed student loans, and lease financing contracts;

   (ii)   all Liens, rights (including rights of set-off), remedies, powers, privileges, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or for the benefit of, the holder of the obligations or instruments referred to in clause (i) above, including but not limited to those arising under or based upon Credit Documents, casualty insurance policies and binders, standby letters of credit, mortgagee title insurance policies and binders, payment bonds and performance bonds at any time and from time to time existing with respect to any of the obligations or instruments referred to in clause (i) above; and

   (iii)  all amendments, modifications, renewals, extensions, refinancings, and refundings of or for any of the foregoing;

provided, that there shall be excluded from the definition of "Loans" amounts owing under Qualified Financial Contracts.

"**Obligor**" means each Person liable for the full or partial payment or performance of any Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly, or severally.

5

"**Other Real Estate**" means all interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights that are owned by the Failed Bank.

"**Payment Date**" means the first Business Day after Bank Closing.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation.

"**Primary Indemnitor**" means any Person (other than the Assuming Bank or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XII, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

"**Proforma**" means producing a balance sheet that reflects a reasonably accurate financial statement of the Failed Bank through the date of closing. The Proforma financial statements serve as a basis for the opening entries of both the Assuming Bank and the Receiver.

"**Put Date**" has the meaning provided in Section 3.4.

"**Put Notice**" has the meaning provided in Section 3.4.

"**Qualified Financial Contract**" means a qualified financial contract as defined in 12 U.S.C. Section 1821(e)(8)(D).

"**Record**" means any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at Bank Closing.

"**Related Liability**" with respect to any Asset means any liability existing and reflected on the Accounting Records of the Failed Bank as of Bank Closing for (i) indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting such Asset, (ii) ad valorem taxes applicable to such Asset, and (iii) any other obligation determined by the Receiver to be directly related to such Asset.

"**Related Liability Amount**" with respect to any Related Liability on the books of the Assuming Bank, means the amount of such Related Liability as stated on the Accounting Records of the Assuming Bank (as maintained in accordance with generally accepted accounting principles) as of the date as of which the Related Liability Amount is being determined. With respect to a liability that relates to more than one asset, the amount of such Related Liability shall be allocated among such assets for the purpose of determining the Related Liability Amount with

6

respect to any one of such assets. Such allocation shall be made by specific allocation, where determinable, and otherwise shall be pro rata based upon the dollar amount of such assets stated on the Accounting Records of the entity that owns such asset.

"**Required Payment**" means $50,000,000.00.

"**Repurchase Price**" means with respect to any Asset or asset, which shall be determined by the Receiver, the lesser of (a) or (b):

(a)    (i) in the event of a negative Bid Amount, the amount paid by the Assuming Bank, discounted by a percentage equal to the quotient produced by dividing the Assuming Bank's Bid Amount by the aggregate Book Value of the Risk Assets of the Failed Bank;

(ii) in the event of a negative Bid Amount, the amount resulting from (a)(i), above, or in the event of a positive Bid Amount, the amount paid by the Assuming Bank, (x) for a Loan, shall be decreased by any portion of the Loan classified "loss" and by one-half of any portion of the Loan classified "doubtful" as of the date of Bank Closing, and (y) for any Asset or asset, including a Loan, decreased by the amount of any money received with respect thereto since Bank Closing and, if the Asset is a Loan or other interest bearing or earning asset, the resulting amount shall then be increased or decreased, as the case may be, by interest or discount (whichever is applicable) accrued from and after Bank Closing at the lower of: (i) the contract rate with respect to such Asset, or (ii) the Settlement Interest Rate; net proceeds received by or due to the Assuming Bank from the sale of collateral, any forgiveness of debt, or otherwise shall be deemed money received by the Assuming Bank; or

(b)    the dollar amount thereof stated on the Accounting Records of the Assuming Bank as of the date as of which the Repurchase Price is being determined, as maintained in accordance with generally accepted accounting principles, and, if the asset is a Loan, regardless of the Legal Balance thereof and adjusted in the same manner as the Book Value of a Failed Bank Loan would be adjusted hereunder.

Provided, however, (b), above, shall not be applicable and the Bid Amount shall be considered to have been positive for Loans repurchased pursuant to Section 3.4(a).

"**Risk Assets**" means (i) all Loans purchased hereunder, excluding (a) New Loans and (b) Loans to the extent secured by Assumed Deposits (and not included in (i)(a)), plus (ii) the Accrued Interest Receivable, Prepaid Expense, and Other Assets.

"**Safe Deposit Boxes**" means the safe deposit boxes of the Failed Bank, if any, including the removable safe deposit boxes and safe deposit stacks in the Failed Bank's vault(s), all rights and benefits (other than fees collected prior to Bank Closing) under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

"**Settlement Date**" means the first Business Day immediately prior to the day which is one hundred eighty (180) days after Bank Closing, or such other date prior thereto as

7

may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its discretion, may extend the Settlement Date.

"**Settlement Interest Rate**" means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Receiver to be equal to the equivalent coupon issue yield on twenty-six (26)-week United States Treasury Bills in effect as of Bank Closing as published in The Wall Street Journal; provided, that if no such equivalent coupon issue yield is available as of Bank Closing, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to Bank Closing shall be used. Thereafter, the rate shall be adjusted to the rate determined by the Receiver to be equal to the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

"**Subsidiary**" has the meaning set forth in Section 3(w)(4) of the Federal Deposit Insurance Act, 12 U.S.C. Section 1813(w)(4), as amended.

## ARTICLE II
## ASSUMPTION OF LIABILITIES

**2.1**     **Liabilities Assumed by Assuming Bank.** Subject to Sections 2.5 and 4.8, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed").  Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

**2.2**     **Interest on Deposit Liabilities.** The Assuming Bank agrees that it will assume all deposit contracts as of Bank Closing, and it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 at the same rate(s) and on the same terms as agreed to by the Failed Bank as existed as of Bank Closing. If such Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge.

**2.3**     **Unclaimed Deposits.** If, within eighteen (18) months after Bank Closing, any depositor of the Failed Bank does not claim or arrange to continue such depositor's Deposit assumed pursuant to Section 2.1 at the Assuming Bank, the Assuming Bank shall, within fifteen (15) Business Days after the end of such eighteen (18)-month period, (i) refund to the Corporation the full amount of each such Deposit (without reduction for service charges), (ii) provide to the Corporation an electronic schedule of all such refunded Deposits in such form as may be prescribed by the Corporation, and (iii) assign, transfer, convey and deliver to the Receiver all right, title and interest of the Assuming Bank in and to Records previously transferred to the Assuming Bank and other records generated or maintained by the Assuming Bank pertaining to such Deposits. During such eighteen (18)-month period, at the request of the

8

Corporation, the Assuming Bank promptly shall provide to the Corporation schedules of unclaimed deposits in such form as may be prescribed by the Corporation.

**2.4** **Omitted**.

**2.5** **Borrower Claims**. Notwithstanding anything to the contrary in this Agreement, any liability associated with borrower claims for payment of or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower, whether or not such liability is reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, judicial or extra-judicial, secured or unsecured, whether asserted affirmatively or defensively, related in any way to any loan or commitment to lend made by the Failed Bank prior to failure, or to any loan made by a third party in connection with a loan which is or was held by the Failed Bank, or otherwise arising in connection with the Failed Bank's lending or loan purchase activities are specifically not assumed by the Assuming Bank.

## ARTICLE III
## PURCHASE OF ASSETS

**3.1** **Assets Purchased by Assuming Bank**. Subject to Sections 3.5, 3.6 and 4.8, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing. Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1. The subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a. Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

**3.2** **Asset Purchase Price**.

(a)      All Assets and assets of the Failed Bank subject to an option to purchase by the Assuming Bank shall be purchased for the amount, or the amount resulting from the method specified for determining the amount, as specified on Schedule 3.2, except as otherwise may be provided herein. Any Asset, asset of the Failed Bank subject to an option to purchase or other asset purchased for which no purchase price is specified on Schedule 3.2 or otherwise herein shall be purchased at its Book Value. Loans or other assets charged off the Accounting Records of the Failed Bank prior to the date of Bank Closing shall be purchased at a price of zero.

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

Exhibit F- Pg. 74

(b)      The purchase price for securities (other than the capital stock of any Acquired
Subsidiary) purchased under Section 3.1 by the Assuming Bank shall be the market value thereof
as of Bank Closing, which market value shall be (i) the "Mid/Last", or "Trade" (as applicable),
market price for each such security quoted at the close of the trading day effective on Bank
Closing as published electronically by Bloomberg, L.P.; (ii) provided, that if such market price is
not available for any such security, the Assuming Bank will submit a bid  for each such security
within three days of notification/bid request by the Receiver (unless a different time period is
agreed to by the Assuming Bank and the Receiver) and the Receiver, in its sole discretion will
accept or reject each such bid; and (iii) further provided in the absence of an acceptable bid from
the Assuming Bank, each such security shall not pass to the Assuming Bank and shall be deemed
to be an excluded asset hereunder.

(c)      Qualified Financial Contracts shall be purchased at market value determined in
accordance with the terms of Exhibit 3.2(c). Any costs associated with such valuation shall be
shared equally by the Receiver and the Assuming Bank.

3.3      **Manner of Conveyance; Limited Warranty; Nonrecourse; Etc.** THE
CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY
INTERESTS, PURCHASED BY THE ASSUMING BANK UNDER THIS AGREEMENT
SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF
SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE
SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES
WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH
RESPECT TO TITLE, ENFORCEABILITY, COLLECTIBILITY, DOCUMENTATION OR
FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY
OTHER MATTERS.

3.4      **Puts of Assets to the Receiver**.

(a)      **Omitted**.

(b)      **Puts Prior to the Settlement Date**. During the period from Bank Closing to and
including the Business Day immediately preceding the Settlement Date, the Assuming Bank shall
be entitled to require the Receiver to purchase any Asset which the Assuming Bank can establish
is evidenced by forged or stolen instruments as of Bank Closing. The Assuming Bank shall
transfer all such Assets to the Receiver without recourse, and shall indemnify the Receiver
against any and all claims of any Person claiming by, through or under the Assuming Bank with
respect to any such Asset, as provided in Section 12.4.

(c)      **Notices to the Receiver**. In the event that the Assuming Bank elects to require the
Receiver to purchase one or more Assets, the Assuming Bank shall deliver to the Receiver a
notice (a "Put Notice") which shall include:

(i)       a list of all Assets that the Assuming Bank requires the Receiver to
purchase;

10

(ii)     a list of all Related Liabilities with respect to the Assets identified
pursuant to (i) above; and

(iii)    a statement of the estimated Repurchase Price of each Asset identified
pursuant to (i) above as of the applicable Put Date.

Such notice shall be in the form prescribed by the Receiver or such other form to which the
Receiver shall consent. As provided in Section 9.6, the Assuming Bank shall deliver to the
Receiver such documents, Credit Files and such additional information relating to the subject
matter of the Put Notice as the Receiver may request and shall provide to the Receiver full access
to all other relevant books and records.

(d)     **Purchase by Receiver**. The Receiver shall purchase Loans that are specified in
the Put Notice and shall assume Related Liabilities with respect to such Loans, and the transfer of
such Loans and Related Liabilities shall be effective as of a date determined by the Receiver
which date shall not be later than thirty (30) days after receipt by the Receiver of the Credit Files
with respect to such Loans (the "Put Date").

(e)     **Purchase Price and Payment Date**. Each Loan purchased by the Receiver
pursuant to this Section 3.4 shall be purchased at a price equal to the Repurchase Price of such
Loan less the Related Liability Amount applicable to such Loan, in each case determined as of
the applicable Put Date. If the difference between such Repurchase Price and such Related
Liability Amount is positive, then the Receiver shall pay to the Assuming Bank the amount of
such difference; if the difference between such amounts is negative, then the Assuming Bank
shall pay to the Receiver the amount of such difference. The Assuming Bank or the Receiver, as
the case may be, shall pay the purchase price determined pursuant to this Section 3.4(e) not later
than the twentieth (20th) Business Day following the applicable Put Date, together with interest
on such amount at the Settlement Interest Rate for the period from and including such Put Date
to and including the day preceding the date upon which payment is made.

(f)     **Servicing**. The Assuming Bank shall administer and manage any Asset subject to
purchase by the Receiver in accordance with usual and prudent banking standards and business
practices until such time as such Asset is purchased by the Receiver.

(g)     **Reversals**. In the event that the Receiver purchases an Asset (and assumes the
Related Liability) that it is not required to purchase pursuant to this Section 3.4, the Assuming
Bank shall repurchase such Asset (and assume such Related Liability) from the Receiver at a
price computed so as to achieve the same economic result as would apply if the Receiver had
never purchased such Asset pursuant to this Section 3.4.

3.5     **Assets Not Purchased by Assuming Bank**. The Assuming Bank does not
purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement)
obtain an option to purchase, acquire or assume under this Agreement the assets or Assets listed
on the attached Schedule 3.5.

3.6     **Assets Essential to Receiver**.

11

(a)     The Receiver may refuse to sell to the Assuming Bank, or the Assuming Bank
agrees, at the request of the Receiver set forth in a written notice to the Assuming Bank, to
assign, transfer, convey, and deliver to the Receiver all of the Assuming Bank's right, title and
interest in and to, any Asset or asset essential to the Receiver as determined by the Receiver in its
discretion (together with all Credit Documents evidencing or pertaining thereto), which may
include any Asset or asset that the Receiver determines to be:

> (i)     made to an officer, director, or other Person engaging in the affairs of the
> Failed Bank, its Subsidiaries or Affiliates or any related entities of any of
> the foregoing;

> (ii)    the subject of any investigation relating to any claim with respect to any
> item described in Section 3.5(a) or (b), or the subject of, or potentially the
> subject of, any legal proceedings;

> (iii)   made to a Person who is an Obligor on a loan owned by the Receiver or
> the Corporation in its corporate capacity or its capacity as receiver of any
> institution;

> (iv)    secured by collateral which also secures any asset owned by the Receiver;
> or

> (v)     related to any asset of the Failed Bank not purchased by the Assuming
> Bank under this Article III or any liability of the Failed Bank not assumed
> by the Assuming Bank under Article II.

(b)     Each such Asset or asset purchased by the Receiver shall be purchased at a price
equal to the Repurchase Price thereof less the Related Liability Amount with respect to any
Related Liabilities related to such Asset or asset, in each case determined as of the date of the
notice provided by the Receiver pursuant to Section 3.6(a). The Receiver shall pay the Assuming
Bank not later than the twentieth (20th) Business Day following receipt of related Credit
Documents and Credit Files together with interest on such amount at the Settlement Interest Rate
for the period from and including the date of receipt of such documents to and including the day
preceding the day on which payment is made. The Assuming Bank agrees to administer and
manage each such Asset or asset in accordance with usual and prudent banking standards and
business practices until each such Asset or asset is purchased by the Receiver. All transfers with
respect to Asset or assets under this Section 3.6 shall be made as provided in Section 9.6. The
Assuming Bank shall transfer all such Asset or assets and Related Liabilities to the Receiver
without recourse, and shall indemnify the Receiver against any and all claims of any Person
claiming by, through or under the Assuming Bank with respect to any such Asset or asset, as
provided in Section 12.4.

## ARTICLE IV

12

## ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS

The Assuming Bank agrees with the Receiver and the Corporation as follows:

**4.1     Continuation of Banking Business**. The Assuming Bank agrees to provide full service banking in the trade area of the Failed Bank commencing on the first banking business day (including a Saturday) after Bank Closing. At the option of the Assuming Bank, such banking services may be provided at any or all of the Bank Premises, or at other premises within such trade area.

**4.2     Agreement with Respect to Debit and Credit Card Business**. The Assuming Bank agrees to honor and perform, from and after Bank Closing, all duties and obligations with respect to the Failed Bank's debit and credit card business, and/or processing related to debit and credit cards, if any, and assumes all outstanding extensions of credit with respect thereto.

**4.3     Agreement with Respect to Safe Deposit Business**. The Assuming Bank assumes and agrees to discharge, from and after Bank Closing, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to all Safe Deposit Boxes, if any, of the Failed Bank and to maintain all of the necessary facilities for the use of such boxes by the renters thereof during the period for which such boxes have been rented and the rent therefor paid to the Failed Bank, subject to the provisions of the rental agreements between the Failed Bank and the respective renters of such boxes; provided, that the Assuming Bank may relocate the Safe Deposit Boxes of the Failed Bank to any office of the Assuming Bank located in the trade area of the Failed Bank. Fees related to the safe deposit business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

**4.4     Agreement with Respect to Safekeeping Business**. The Receiver transfers, conveys and delivers to the Assuming Bank and the Assuming Bank accepts all securities and other items, if any, held by the Failed Bank in safekeeping for its customers as of Bank Closing. The Assuming Bank assumes and agrees to honor and discharge, from and after Bank Closing, the duties and obligations of the Failed Bank with respect to such securities and items held in safekeeping. The Assuming Bank shall be entitled to all rights and benefits heretofore accrued or hereafter accruing with respect thereto; provided, that, fees related to the safe keeping business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank. The Assuming Bank shall provide to the Receiver written verification of all assets held by the Failed Bank for safekeeping within sixty (60) days after Bank Closing.

**4.5     Agreement with Respect to Trust Business**.

(a)     The Assuming Bank shall, without further transfer, substitution, act or deed, to the full extent permitted by law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements, and trusts of the Failed Bank under trusts, executorships, administrations, guardianships, and agencies, and other fiduciary or representative capacities, all to the same extent as though the Assuming Bank had assumed the same from the Failed Bank prior to Bank

13

Closing; provided, that any liability based on the misfeasance, malfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business is not assumed hereunder.

(b)    The Assuming Bank shall, to the full extent permitted by law, succeed to, and be entitled to take and execute, the appointment to all executorships, trusteeships, guardianships and other fiduciary or representative capacities to which the Failed Bank is or may be named in wills, whenever probated, or to which the Failed Bank is or may be named or appointed by any other instrument.

(c)    In the event additional proceedings of any kind are necessary to accomplish the transfer of such trust business, the Assuming Bank agrees that, at its own expense, it will take whatever action is necessary to accomplish such transfer. The Receiver agrees to use reasonable efforts to assist the Assuming Bank in accomplishing such transfer.

(d)    The Assuming Bank shall provide to the Receiver written verification of the assets held in connection with the Failed Bank's trust business within sixty (60) days after Bank Closing.

4.6    **Agreement with Respect to Bank Premises**.

(a)    **Option to Lease.** The Receiver hereby grants to the Assuming Bank an exclusive option for the period of ninety (90) days commencing the day after Bank Closing to cause the Receiver to assign to the Assuming Bank any or all leases for leased Bank Premises, if any, which have been continuously occupied by the Assuming Bank from Bank Closing to the date it elects to accept an assignment of the leases with respect thereto to the extent such leases can be assigned; provided, that the exercise of this option with respect to any lease must be as to all premises or other property subject to the lease. If an assignment cannot be made of any such leases, the Receiver may, in its discretion, enter into subleases with the Assuming Bank containing the same terms and conditions provided under such existing leases for such leased Bank Premises or other property. The Assuming Bank shall give notice to the Receiver within the option period of its election to accept or not to accept an assignment of any or all leases (or enter into subleases or new leases in lieu thereof). The Assuming Bank agrees to assume all leases assigned (or enter into subleases in lieu thereof) pursuant to this Section 4.6.

(b)    **Facilitation.** The Receiver agrees to facilitate the assumption, assignment or sublease of leases or the negotiation of new leases by the Assuming Bank; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation, make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation or commit to any other obligations to third parties.

(c)    **Occupancy.** The Assuming Bank shall give the Receiver fifteen (15) days' prior written notice of its intention to vacate prior to vacating any leased Bank Premises with respect to which the Assuming Bank has not exercised the option provided in Section 4.6(a). Any such notice shall be deemed to terminate the Assuming Bank's option with respect to such leased Bank Premises.

14

(d)   **Occupancy Costs.**

(i)   The Assuming Bank agrees, during the period of any occupancy by it of leased Bank Premises, to pay to the Receiver, or to appropriate third parties at the direction of the Receiver, all operating costs with respect thereto and to comply with all relevant terms of applicable leases entered into by the Failed Bank, including without limitation the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

(ii)   The Assuming Bank agrees during the period of occupancy by it of leased Bank Premises to pay to the Receiver rent for the use of all leased Furniture and Equipment and all owned or leased Fixtures located on such Bank Premises for the period of such occupancy. Rent for such property owned by the Failed Bank shall be the market rental value thereof, as determined by the Receiver within sixty (60) days after Bank Closing. Rent for such leased property shall be an amount equal to any and all rent and other amounts which the Receiver incurs or accrues as an obligation or is obligated to pay for such period of occupancy pursuant to all leases and contracts with respect to such property. If the Assuming Bank purchases any owned Fixtures in accordance with Section 4.6(f), the amount of any rents paid by the Assuming Bank with respect thereto shall be applied as an offset against the purchase price thereof.

(e)   **Certain Requirements as to Furniture, Equipment and Fixtures.** If the Assuming Bank accepts an assignment of the lease (or enters into a sublease or a new lease in lieu thereof) for leased Bank Premises, or if the Assuming Bank does not exercise such option but within twelve (12) months following Bank Closing obtains the right to occupy such premises (whether by assignment, lease, sublease, purchase or otherwise), other than in accordance with Section 4.6(a), the Assuming Bank shall (i) accept an assignment or a sublease of the leases or negotiate new leases for all Furniture and Equipment and Fixtures leased by the Failed Bank and located thereon, and (ii) if applicable, accept an assignment or a sublease of any ground lease or negotiate a new ground lease with respect to any land on which such Bank Premises are located; provided, that the Receiver shall not have disposed of such Furniture and Equipment and Fixtures or repudiated the leases specified in clause (i) or (ii).

(f)   **Vacating Premises.** If the Assuming Bank elects not to accept an assignment of the lease or sublease any leased Bank Premises, the notice of such election in accordance with Section 4.6(a) shall specify the date upon which the Assuming Bank's occupancy of such leased Bank Premises shall terminate, which date shall not be later than the date which is one hundred eighty (180) days after Bank Closing. Upon vacating such premises, the Assuming Bank shall relinquish and release to the Receiver such premises and the Fixtures located thereon in the same condition as at Bank Closing, normal wear and tear excepted. By failing to provide notice of its intention to vacate such premises prior to the expiration of the option period specified in Section 4.6(a), or by occupying such premises after the one hundred eighty (180)-day period specified above in this paragraph, the Assuming Bank shall, at the Receiver's option, (x) be deemed to have assumed all leases, obligations and liabilities with respect to such premises (including any ground lease with respect to the land on which premises are located), and leased Furniture and Equipment and leased Fixtures located thereon in accordance with this Section 4.6 (unless the

15

Receiver previously repudiated any such lease), and (y) be required to purchase all Fixtures owned by the Failed Bank and located on such premises as of Bank Closing.

    (g)    **Omitted.**

**4.7**    **Agreement with Respect to Leased Data Processing Equipment**

    (a)    The Receiver hereby grants to the Assuming Bank an exclusive option for the period of ninety (90) days commencing the day after Bank Closing to accept an assignment from the Receiver of any or all Data Processing Leases to the extent that such Data Processing Leases can be assigned.

    (b)    The Assuming Bank shall (i) give written notice to the Receiver within the option period specified in Section 4.7(a) of its intent to accept an assignment or sublease of any or all Data Processing Leases and promptly accept an assignment or sublease of such Data Processing Leases, and (ii) give written notice to the appropriate lessor(s) that it has accepted an assignment or sublease of any such Data Processing Leases.

    (c)    The Receiver agrees to facilitate the assignment or sublease of Data Processing Leases or the negotiation of new leases or license agreements by the Assuming Bank; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation or make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation.

    (d)    The Assuming Bank agrees, during its period of use of any property subject to a Data Processing Lease, to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of the applicable Data Processing Leases entered into by the Failed Bank, including without limitation the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

    (e)    The Assuming Bank shall, not later than fifty (50) days after giving the notice provided in Section 4.7(b), (i) relinquish and release to the Receiver all property subject to the relevant Data Processing Lease, in the same condition as at Bank Closing, normal wear and tear excepted, or (ii) accept an assignment or a sublease thereof or negotiate a new lease or license agreement under this Section 4.7.

**4.8**    **Agreement with Respect to Certain Existing Agreements**.

    With respect to agreements existing as of Bank Closing which provide for the rendering of services by or to the Failed Bank, within one hundred twenty (120) days after Bank Closing, the Assuming Bank shall give the Receiver written notice specifying whether it elects to assume or not to assume each such agreement. Except as may be otherwise provided in this Article IV, the Assuming Bank agrees to comply with the terms of each such agreement for a period commencing on the day after Bank Closing and ending on: (i) in the case of an agreement that provides for the rendering of services by the Failed Bank, the date which is ninety (90) days after Bank Closing, and (ii) in the case of an agreement that provides for the rendering of services to

the Failed Bank, the date which is thirty (30) days after the Assuming Bank has given notice to the Receiver of its election not to assume such agreement; provided, that the Receiver can reasonably make such service agreements available to the Assuming Bank. The Assuming Bank shall be deemed by the Receiver to have assumed agreements for which no notification is timely given. The Receiver agrees to assign, transfer, convey, and deliver to the Assuming Bank all right, title and interest of the Receiver, if any, in and to agreements the Assuming Bank assumes hereunder. In the event the Assuming Bank elects not to accept an assignment of any lease (or sublease) or negotiate a new lease for leased Bank Premises under Section 4.6 and does not otherwise occupy such premises, the provisions of this Section 4.8 shall not apply to service agreements related to such premises. The Assuming Bank agrees, during the period it has the use or benefit of any such agreement, promptly to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of such agreement. This paragraph shall not apply with respect to deposit contracts which are expressly assumed by the Assuming Bank under Section 2.2 of this Agreement.

**4.9    Informational Tax Reporting.** The Assuming Bank agrees to perform all obligations of the Failed Bank with respect to Federal and State income tax informational reporting related to (i) the Assets and the Liabilities Assumed, (ii) deposit accounts that were closed and loans that were paid off or collateral obtained with respect thereto prior to Bank Closing, (iii) miscellaneous payments made to vendors of the Failed Bank, and (iv) any other asset or liability of the Failed Bank, including, without limitation, loans not purchased and Deposits not assumed by the Assuming Bank, as may be required by the Receiver.

Under a private letter ruling (PLR) issued to the FDIC in January of 1988, the Internal Revenue Service will allow the Assuming Bank to report for the Failed Bank transactions under its own TIN for the entire year 2008; there is no need to dual-report for different payors in pre- v. post-closing date periods.

The Assuming Bank agrees to prepare on behalf of the Receiver all required Federal and State compliance and income/franchise tax returns for the Failed Bank and acquired subsidiary entities as of Bank Closing. The returns will be provided to the Receiver within the statutorily required filing timeframe.

**4.10    Insurance.** The Assuming Bank agrees to obtain insurance coverage effective from and after Bank Closing, including public liability, fire and extended coverage insurance acceptable to the Receiver with respect to leased Bank Premises that it occupies, and all leased Furniture and Equipment and Fixtures and leased data processing equipment (including hardware and software) located thereon, in the event such insurance coverage is not already in force and effect with respect to the Assuming Bank as the insured as of Bank Closing. All such insurance shall, where appropriate (as determined by the Receiver), name the Receiver as an additional insured.

**4.11    Office Space for Receiver and Corporation.** For the period commencing on the day following Bank Closing and ending on the one hundred eightieth (180th) day thereafter, the Assuming Bank agrees to provide to the Receiver and the Corporation, without charge, adequate

17

and suitable office space (including parking facilities and vault space), furniture, equipment (including photocopying and telecopying machines) and utilities (including local telephone service and a dedicated broadband or T-1 internet service) at the Bank Premises occupied by the Assuming Bank for their use in the discharge of their respective functions with respect to the Failed Bank. In the event the Receiver and the Corporation determine that the space provided is inadequate or unsuitable, the Receiver and the Corporation may relocate to other quarters having adequate and suitable space and the costs of relocation and any rental and utility costs for the balance of the period of occupancy by the Receiver and the Corporation shall be borne by the Assuming Bank.

    4.12    **Omitted.**

    4.13    **Omitted.**

## ARTICLE V
## DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK

    5.1    **Payment of Checks, Drafts and Orders.** Subject to Section 9.5, the Assuming Bank agrees to pay all properly drawn checks, drafts and withdrawal orders of depositors of the Failed Bank presented for payment, whether drawn on the check or draft forms provided by the Failed Bank or by the Assuming Bank, to the extent that the Deposit balances to the credit of the respective makers or drawers assumed by the Assuming Bank under this Agreement are sufficient to permit the payment thereof, and in all other respects to discharge, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to the Deposit balances due and owing to the depositors of the Failed Bank assumed by the Assuming Bank under this Agreement.

    5.2    **Certain Agreements Related to Deposits.** Subject to Section 2.2, the Assuming Bank agrees to honor the terms and conditions of any written escrow or mortgage servicing agreement or other similar agreement relating to a Deposit liability assumed by the Assuming Bank pursuant to this Agreement.

    5.3    **Notice to Depositors.**

    (a)    Within thirty (30) days after Bank Closing, the Assuming Bank shall give (i) notice to depositors of the Failed Bank of its assumption of the Deposit liabilities of the Failed Bank, and (ii) any notice required under Section 2.2, by mailing to each such depositor a notice with respect to such assumption and by advertising in a newspaper of general circulation in the county or counties in which the Failed Bank was located. The Assuming Bank agrees that it will obtain prior approval of all such notices and advertisements from counsel for the Receiver and that such notices and advertisements shall not be mailed or published until such approval is received.

    (b)    The Assuming Bank shall give notice by mail to depositors of the Failed Bank concerning the procedures to claim their deposits, which notice shall be provided to the

Assuming Bank by the Receiver or the Corporation. Such notice shall be included with the notice to depositors to be mailed by the Assuming Bank pursuant to Section 5.3(a).

(c)     If the Assuming Bank proposes to charge fees different from those charged by the Failed Bank before it establishes new deposit account relationships with the depositors of the Failed Bank, the Assuming Bank shall give notice by mail of such changed fees to such depositors.

**ARTICLE VI**
**RECORDS**

6.1     **Transfer of Records**.

(a)     In accordance with Section 3.1, the Receiver assigns, transfers, conveys and delivers to the Assuming Bank the following Records pertaining to the Deposit liabilities of the Failed Bank assumed by the Assuming Bank under this Agreement, except as provided in Section 6.4:

      (i)     signature cards, orders, contracts between the Failed Bank and its depositors and Records of similar character;

      (ii)     passbooks of depositors held by the Failed Bank, deposit slips, cancelled checks and withdrawal orders representing charges to accounts of depositors;

and the following Records pertaining to the Assets:

      (iii)     records of deposit balances carried with other banks, bankers or trust companies;

      (iv)     Loan and collateral records and Credit Files and other documents;

      (v)     deeds, mortgages, abstracts, surveys, and other instruments or records of title pertaining to real estate or real estate mortgages;

      (vi)     signature cards, agreements and records pertaining to Safe Deposit Boxes, if any; and

      (vii)     records pertaining to the credit card business, trust business or safekeeping business of the Failed Bank, if any.

(b)     The Receiver, at its option, may assign and transfer to the Assuming Bank by a single blanket assignment or otherwise, as soon as practicable after Bank Closing, any other Records not assigned and transferred to the Assuming Bank as provided in this Agreement, including but not limited to loan disbursement checks, general ledger tickets, official bank checks, proof transactions (including proof tapes) and paid out loan files.

19

**6.2**     **Delivery of Assigned Records**. The Receiver shall deliver to the Assuming Bank all Records described in (i) Section 6.1(a) as soon as practicable on or after the date of this Agreement, and (ii) Section 6.1(b) as soon as practicable after making any assignment described therein.

**6.3**     **Preservation of Records**. The Assuming Bank agrees that it will preserve and maintain for the joint benefit of the Receiver, the Corporation and the Assuming Bank, all Records of which it has custody for such period as either the Receiver or the Corporation in its discretion may require, until directed otherwise, in writing, by the Receiver or Corporation. The Assuming Bank shall have the primary responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Records of which it has custody.

**6.4**     **Access to Records; Copies**. The Assuming Bank agrees to permit the Receiver and the Corporation access to all Records of which the Assuming Bank has custody, and to use, inspect, make extracts from or request copies of any such Records in the manner and to the extent requested, and to duplicate, in the discretion of the Receiver or the Corporation, any Record in the form of microfilm or microfiche pertaining to Deposit account relationships; provided, that in the event that the Failed Bank maintained one or more duplicate copies of such microfilm or microfiche Records, the Assuming Bank hereby assigns, transfers, and conveys to the Corporation one such duplicate copy of each such Record without cost to the Corporation, and agrees to deliver to the Corporation all Records assigned and transferred to the Corporation under this Article VI as soon as practicable on or after the date of this Agreement. The party requesting a copy of any Record shall bear the cost (based on standard accepted industry charges to the extent applicable, as determined by the Receiver) for providing such duplicate Records. A copy of each Record requested shall be provided as soon as practicable by the party having custody thereof.

**ARTICLE VII**
**BID; INITIAL PAYMENT**

The Assuming Bank has submitted to the Receiver a positive bid of $1,888,000,000.00 for the Assets purchased and Liabilities Assumed hereunder (the "Bid Amount"). On the Payment Date, the Assuming Bank will pay to the Corporation, or the Corporation will pay to the Assuming Bank, as the case may be, the Initial Payment, together with interest on such amount (if the Payment Date is not the day following the day of Bank Closing) from and including the day following Bank Closing to and including the day preceding the Payment Date at the Settlement Interest Rate.

**ARTICLE VIII**
**PROFORMA**

20

The Assuming Bank, as soon as practical after Bank Closing, in accordance with the best information then available, shall provide to the Receiver a Proforma Statement of Condition indicating all assets and liabilities of the Failed Bank as shown on the Failed Bank's books and records as of Bank Closing and reflecting which assets and liabilities are passing to the Assuming Bank and which assets and liabilities are to be retained by the Receiver. In addition, the Assuming Bank is to provide to the Receiver, in a standard data request as defined by the Receiver, an electronic database of all loans, deposits, and subsidiaries and other business combinations owned by the Failed Bank as of Bank Closing.  See Schedule 3.1a.

**ARTICLE IX**
**CONTINUING COOPERATION**

**9.1**    **General Matters**. The parties hereto agree that they will, in good faith and with their best efforts, cooperate with each other to carry out the transactions contemplated by this Agreement and to effect the purposes hereof.

**9.2**    **Additional Title Documents**. The Receiver, the Corporation and the Assuming Bank each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the appropriate party its full legal or equitable title in and to the property transferred pursuant to this Agreement or to be transferred in accordance herewith. The Assuming Bank shall prepare such instruments and documents of conveyance (in form and substance satisfactory to the Receiver) as shall be necessary to vest title to the Assets in the Assuming Bank. The Assuming Bank shall be responsible for recording such instruments and documents of conveyance at its own expense.

**9.3**    **Claims and Suits**.

(a)     The Receiver shall have the right, in its discretion, to (i) defend or settle any claim or suit against the Assuming Bank with respect to which the Receiver has indemnified the Assuming Bank in the same manner and to the same extent as provided in Article XII, and (ii) defend or settle any claim or suit against the Assuming Bank with respect to any Liability Assumed, which claim or suit may result in a loss to the Receiver arising out of or related to this Agreement, or which existed against the Failed Bank on or before Bank Closing. The exercise by the Receiver of any rights under this Section 9.3(a) shall not release the Assuming Bank with respect to any of its obligations under this Agreement.

(b)     In the event any action at law or in equity shall be instituted by any Person against the Receiver and the Corporation as codefendants with respect to any asset of the Failed Bank retained or acquired pursuant to this Agreement by the Receiver, the Receiver agrees, at the request of the Corporation, to join with the Corporation in a petition to remove the action to the United States District Court for the proper district. The Receiver agrees to institute, with or without joinder of the Corporation as coplaintiff, any action with respect to any such retained or acquired asset or any matter connected therewith whenever notice requiring such action shall be given by the Corporation to the Receiver.

21

**9.4    Payment of Deposits**. In the event any depositor does not accept the obligation of the Assuming Bank to pay any Deposit liability of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement and asserts a claim against the Receiver for all or any portion of any such Deposit liability, the Assuming Bank agrees on demand to provide to the Receiver funds sufficient to pay such claim in an amount not in excess of the Deposit liability reflected on the books of the Assuming Bank at the time such claim is made. Upon payment by the Assuming Bank to the Receiver of such amount, the Assuming Bank shall be discharged from any further obligation under this Agreement to pay to any such depositor the amount of such Deposit liability paid to the Receiver.

**9.5    Withheld Payments**. At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance. If such deposit balance has been paid to the depositor prior to a demand for return by the Corporation or the Receiver, and payment of such deposit balance had not been previously withheld pursuant to this Section, the Assuming Bank shall not be obligated to return such deposit balance to the Receiver or the Corporation. The Assuming Bank shall be obligated to reimburse the Corporation or the Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the Assuming Bank in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section.

**9.6    Proceedings with Respect to Certain Assets and Liabilities**.

(a)    In connection with any investigation, proceeding or other matter with respect to any asset or liability of the Failed Bank retained by the Receiver, or any asset of the Failed Bank acquired by the Receiver pursuant to this Agreement, the Assuming Bank shall cooperate to the extent reasonably required by the Receiver.

(b)    In addition to its obligations under Section 6.4, the Assuming Bank shall provide representatives of the Receiver access at reasonable times and locations without other limitation or qualification to (i) its directors, officers, employees and agents and those of the Subsidiaries acquired by the Assuming Bank, and (ii) its books and records, the books and records of such Subsidiaries and all Credit Files, and copies thereof. Copies of books, records and Credit Files

22

shall be provided by the Assuming Bank as requested by the Receiver and the costs of duplication thereof shall be borne by the Receiver.

      (c)    Not later than ten (10) days after the Put Notice pursuant to Section 3.4 or the date of the notice of transfer of any Loan by the Assuming Bank to the Receiver pursuant to Section 3.6, the Assuming Bank shall deliver to the Receiver such documents with respect to such Loan as the Receiver may request, including without limitation the following: (i) all related Credit Documents (other than certificates, notices and other ancillary documents), (ii) a certificate setting forth the principal amount on the date of the transfer and the amount of interest, fees and other charges then accrued and unpaid thereon, and any restrictions on transfer to which any such Loan is subject, and (iii) all Credit Files, and all documents, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) maintained by, owned by, or in the possession of the Assuming Bank or any Affiliate of the Assuming Bank relating to the transferred Loan.

      **9.7**    **Information**. The Assuming Bank promptly shall provide to the Corporation such other information, including financial statements and computations, relating to the performance of the provisions of this Agreement as the Corporation or the Receiver may request from time to time, and, at the request of the Receiver, make available employees of the Failed Bank employed or retained by the Assuming Bank to assist in preparation of the pro forma statement pursuant to Section 8.1.

**ARTICLE X**
**CONDITION PRECEDENT**

      The obligations of the parties to this Agreement are subject to the Receiver and the Corporation having received at or before Bank Closing evidence reasonably satisfactory to each of any necessary approval, waiver, or other action by any governmental authority, the board of directors of the Assuming Bank, or other third party, with respect to this Agreement and the transactions contemplated hereby, the closing of the Failed Bank and the appointment of the Receiver, the chartering of the Assuming Bank, and any agreements, documents, matters or proceedings contemplated hereby or thereby.

**ARTICLE XI**
**REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK**

      The Assuming Bank represents and warrants to the Corporation and the Receiver as follows:

      (a)    **Corporate Existence and Authority**. The Assuming Bank (i) is duly organized, validly existing and in good standing under the laws of its Chartering Authority and has full power and authority to own and operate its properties and to conduct its business as now conducted by it, and (ii) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The Assuming Bank has taken all necessary corporate

23

action to authorize the execution, delivery and performance of this Agreement and the
performance of the transactions contemplated hereby.

     (b)    **Third Party Consents**. No governmental authority or other third party consents
(including but not limited to approvals, licenses, registrations or declarations) are required in
connection with the execution, delivery or performance by the Assuming Bank of this
Agreement, other than such consents as have been duly obtained and are in full force and effect.

     (c)    **Execution and Enforceability**. This Agreement has been duly executed and
delivered by the Assuming Bank and when this Agreement has been duly authorized, executed
and delivered by the Corporation and the Receiver, this Agreement will constitute the legal, valid
and binding obligation of the Assuming Bank, enforceable in accordance with its terms.

     (d)    **Compliance with Law**.

        (i)    Neither the Assuming Bank nor any of its Subsidiaries is in violation of
any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the
United States of America, any State, municipality or other political subdivision or any agency of
any of the foregoing, or any court or other tribunal having jurisdiction over the Assuming Bank
or any of its Subsidiaries or any assets of any such Person, or any foreign government or agency
thereof having such jurisdiction, with respect to the conduct of the business of the Assuming
Bank or of any of its Subsidiaries, or the ownership of the properties of the Assuming Bank or
any of its Subsidiaries, which, either individually or in the aggregate with all other such
violations, would materially and adversely affect the business, operations or condition (financial
or otherwise) of the Assuming Bank or the ability of the Assuming Bank to perform, satisfy or
observe any obligation or condition under this Agreement.

        (ii)    Neither the execution and delivery nor the performance by the Assuming
Bank of this Agreement will result in any violation by the Assuming Bank of, or be in conflict
with, any provision of any applicable law or regulation, or any order, writ or decree of any court
or governmental authority.

     e)    **Representations Remain True**. The Assuming Bank represents and warrants
that it has executed and delivered to the Corporation a Purchaser Eligibility Certification and
Confidentiality Agreement and that all information provided and representations made by or on
behalf of the Assuming Bank in connection with this Agreement and the transactions
contemplated hereby, including, but not limited to, the Purchaser Eligibility Certification and
Confidentiality Agreement (which are affirmed and ratified hereby) are and remain true and
correct in all material respects and do not fail to state any fact required to make the information
contained therein not misleading.

**ARTICLE XII
INDEMNIFICATION**

24

**12.1    Indemnification of Indemnitees**. From and after Bank Closing and subject to the limitations set forth in this Section and Section 12.6 and compliance by the Indemnitees with Section 12.2, the Receiver agrees to indemnify and hold harmless the Indemnitees against any and all costs, losses, liabilities, expenses (including attorneys' fees) incurred prior to the assumption of defense by the Receiver pursuant to paragraph (d) of Section 12.2, judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with claims against any Indemnitee (1) based on liabilities of the Failed Bank that are not assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank for which indemnification is provided hereunder in (a) of this Section 12.1 or (2) described in Section 12.1(a) below subject in each case to certain exclusions as provided in (b) of this Section 12.1:

(a)

(1) claims based on the rights of any shareholder or former shareholder as such of (x) the Failed Bank, or (y) any Subsidiary or Affiliate of the Failed Bank;

(2) claims based on the rights of any creditor as such of the Failed Bank, or any creditor as such of any director, officer, employee or agent of the Failed Bank or any Affiliate of the Failed Bank, with respect to any indebtedness or other obligation of the Failed Bank or any Affiliate of the Failed Bank arising prior to Bank Closing;

(3) claims based on the rights of any present or former director, officer, employee or agent as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank;

(4) claims based on any action or inaction prior to Bank Closing of the Failed Bank, its directors, officers, employees or agents as such, or any Subsidiary or Affiliate of the Failed Bank, or the directors, officers, employees or agents as such of such Subsidiary or Affiliate;

(5) claims based on any malfeasance, misfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business of the Failed Bank, if any;

(6) claims based on any failure or alleged failure (not in violation of law) by the Assuming Bank to continue to perform any service or activity previously performed by the Failed Bank which the Assuming Bank is not required to perform pursuant to this Agreement or which arise under any contract to which the Failed Bank was a party which the Assuming Bank elected not to assume in accordance with this Agreement and which neither the Assuming Bank nor any Subsidiary or Affiliate of the Assuming Bank has assumed subsequent to the execution hereof;

(7) claims arising from any action or inaction of any Indemnitee, including for purposes of this Section 12.1(a)(7) the former officers or employees of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank that is taken upon the specific written direction of the Corporation or the Receiver, other than any action or inaction taken in a manner constituting bad faith, gross negligence or willful misconduct; and

25

(8) claims based on the rights of any depositor of the Failed Bank whose deposit has been accorded "withheld payment" status and/or returned to the Receiver or Corporation in accordance with Section 9.5 and/or has become an "unclaimed deposit" or has been returned to the Corporation or the Receiver in accordance with Section 2.3;

(9) claims asserted by, or derivatively by any shareholder on behalf of, the Failed Bank's parent company based on the process of bidding, negotiation, execution and consummation of the transactions contemplated by this Agreement, provided that (x) the amount of the indemnification paid or payable pursuant to this clause (9) shall not exceed $500,000,000, and (y) the indemnification provided by this clause (9) shall cover only those claims specifically enumerated in the FDIC's approval of the transactions contemplated by this Agreement.

(b)    provided, that, with respect to this Agreement, except for paragraphs (7), (8) and (9) of Section 12.1(a), no indemnification will be provided under this Agreement for any:

(1) judgment or fine against, or any amount paid in settlement (without the written approval of the Receiver) by, any Indemnitee in connection with any action that seeks damages against any Indemnitee (a "counterclaim") arising with respect to any Asset and based on any action or inaction of either the Failed Bank, its directors, officers, employees or agents as such prior to Bank Closing, unless any such judgment, fine or amount paid in settlement exceeds the greater of (i) the Repurchase Price of such Asset, or (ii) the monetary recovery sought on such Asset by the Assuming Bank in the cause of action from which the counterclaim arises; and in such event the Receiver will provide indemnification only in the amount of such excess; and no indemnification will be provided for any costs or expenses other than any costs or expenses (including attorneys' fees) which, in the determination of the Receiver, have been actually and reasonably incurred by such Indemnitee in connection with the defense of any such counterclaim; and it is expressly agreed that the Receiver reserves the right to intervene, in its discretion, on its behalf and/or on behalf of the Receiver, in the defense of any such counterclaim;

(2) claims with respect to any liability or obligation of the Failed Bank that is expressly assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(3) claims with respect to any liability of the Failed Bank to any present or former employee as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank, which liability is expressly assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(4) claims based on the failure of any Indemnitee to seek recovery of damages from the Receiver for any claims based upon any action or inaction of the Failed Bank, its directors, officers, employees or agents as fiduciary, agent or custodian prior to Bank Closing;

(5) claims based on any violation or alleged violation by any Indemnitee of the antitrust, branching, banking or bank holding company or securities laws of the United States of America or any State thereof;

26

(6) claims based on the rights of any present or former creditor, customer, or supplier as such of the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(7) claims based on the rights of any present or former shareholder as such of the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank regardless of whether any such present or former shareholder is also a present or former shareholder of the Failed Bank;

(8) claims, if the Receiver determines that the effect of providing such indemnification would be to (i) expand or alter the provisions of any warranty or disclaimer thereof provided in Section 3.3 or any other provision of this Agreement, or (ii) create any warranty not expressly provided under this Agreement;

(9) claims which could have been enforced against any Indemnitee had the Assuming Bank not entered into this Agreement;

(10) claims based on any liability for taxes or fees assessed with respect to the consummation of the transactions contemplated by this Agreement, including without limitation any subsequent transfer of any Assets or Liabilities Assumed to any Subsidiary or Affiliate of the Assuming Bank;

(11) except as expressly provided in this Article XII, claims based on any action or inaction of any Indemnitee, and nothing in this Agreement shall be construed to provide indemnification for (i) the Failed Bank, (ii) any Subsidiary or Affiliate of the Failed Bank, or (iii) any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates; provided, that the Receiver, in its discretion, may provide indemnification hereunder for any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates who is also or becomes a director, officer, employee or agent of the Assuming Bank or its Subsidiaries or Affiliates;

(12) claims or actions which constitute a breach by the Assuming Bank of the representations and warranties contained in Article XI;

(13) claims arising out of or relating to the condition of or generated by an Asset arising from or relating to the presence, storage or release of any hazardous or toxic substance, or any pollutant or contaminant, or condition of such Asset which violate any applicable Federal, State or local law or regulation concerning environmental protection;

(14) claims based on, related to or arising from any asset, including a loan, acquired or liability assumed by the Assuming Bank, other than pursuant to this Agreement; and

(15) claims based on, related to or arising from any liability specifically not assumed by the Assuming Bank pursuant to Section 2.5 of this Agreement.

**12.2**   **Conditions Precedent to Indemnification**. It shall be a condition precedent to the obligation of the Receiver to indemnify any Person pursuant to this Article XII that such

27

Person shall, with respect to any claim made or threatened against such Person for which such Person is or may be entitled to indemnification hereunder:

(a)    give written notice to the Regional Counsel (Litigation Branch) of the Corporation in the manner and at the address provided in Section 13.7 of such claim as soon as practicable after such claim is made or threatened; provided, that notice must be given on or before the date which is six (6) years from the date of this Agreement;

(b)    provide to the Receiver such information and cooperation with respect to such claim as the Receiver may reasonably require;

(c)    cooperate and take all steps, as the Receiver may reasonably require, to preserve and protect any defense to such claim;

(d)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Receiver the right, which the Receiver may exercise in its sole discretion, to conduct the investigation, control the defense and effect settlement of such claim, including without limitation the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of any such claim, all of which shall be at the expense of the Receiver; provided, that the Receiver shall have notified the Person claiming indemnification in writing that such claim is a claim with respect to which the Person claiming indemnification is entitled to indemnification under this Article XII;

(e)    not incur any costs or expenses in connection with any response or suit with respect to such claim, unless such costs or expenses were incurred upon the written direction of the Receiver; provided, that the Receiver shall not be obligated to reimburse the amount of any such costs or expenses unless such costs or expenses were incurred upon the written direction of the Receiver;

(f)    not release or settle such claim or make any payment or admission with respect thereto, unless the Receiver consents in writing thereto, which consent shall not be unreasonably withheld; provided, that the Receiver shall not be obligated to reimburse the amount of any such settlement or payment unless such settlement or payment was effected upon the written direction of the Receiver; and

(g)    take reasonable action as the Receiver may request in writing as necessary to preserve, protect or enforce the rights of the indemnified Person against any Primary Indemnitor.

12.3    <u>No Additional Warranty</u>. Nothing in this Article XII shall be construed or deemed to (i) expand or otherwise alter any warranty or disclaimer thereof provided under Section 3.3 or any other provision of this Agreement with respect to, among other matters, the title, value, collectibility, genuineness, enforceability or condition of any (x) Asset, or (y) asset of the Failed Bank purchased by the Assuming Bank subsequent to the execution of this Agreement by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank, or (ii) create any warranty not expressly provided under this Agreement with respect thereto.

28

**12.4**   **Indemnification of Receiver and Corporation**. From and after Bank Closing, the Assuming Bank agrees to indemnify and hold harmless the Corporation and the Receiver and their respective directors, officers, employees and agents from and against any and all costs, losses, liabilities, expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with any of the following:

(a)      claims based on any and all liabilities or obligations of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank, whether or not any such liabilities subsequently are sold and/or transferred, other than any claim based upon any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a); and

(b)      claims based on any act or omission of any Indemnitee (including but not limited to claims of any Person claiming any right or title by or through the Assuming Bank with respect to Assets transferred to the Receiver pursuant to Section 3.4 or 3.6), other than any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a).

**12.5**   **Obligations Supplemental**. The obligations of the Receiver, and the Corporation as guarantor in accordance with Section 12.7, to provide indemnification under this Article XII are to supplement any amount payable by any Primary Indemnitor to the Person indemnified under this Article XII. Consistent with that intent, the Receiver agrees only to make payments pursuant to such indemnification to the extent not payable by a Primary Indemnitor. If the aggregate amount of payments by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, and all Primary Indemnitors with respect to any item of indemnification under this Article XII exceeds the amount payable with respect to such item, such Person being indemnified shall notify the Receiver thereof and, upon the request of the Receiver, shall promptly pay to the Receiver, or the Corporation as appropriate, the amount of the Receiver's (or Corporation's) payments to the extent of such excess.

**12.6**   **Criminal Claims**. Notwithstanding any provision of this Article XII to the contrary, in the event that any Person being indemnified under this Article XII shall become involved in any criminal action, suit or proceeding, whether judicial, administrative or investigative, the Receiver shall have no obligation hereunder to indemnify such Person for liability with respect to any criminal act or to the extent any costs or expenses are attributable to the defense against the allegation of any criminal act, unless (i) the Person is successful on the merits or otherwise in the defense against any such action, suit or proceeding, or (ii) such action, suit or proceeding is terminated without the imposition of liability on such Person.

**12.7**   **Limited Guaranty of the Corporation**.  The Corporation hereby guarantees performance of the Receiver's obligation to indemnify the Assuming Bank as set forth in this Article XII. It is a condition to the Corporation's obligation hereunder that the Assuming Bank shall comply in all respects with the applicable provisions of this Article XII. The Corporation shall be liable hereunder only for such amounts, if any, as the Receiver is obligated to pay under the terms of this Article XII but shall fail to pay. Except as otherwise provided above in this Section 12.7, nothing in this Article XII is intended or shall be construed to create any liability or obligation on the part of the Corporation, the United States of America or any department or

29

agency thereof under or with respect to this Article XII, or any provision hereof, it being the intention of the parties hereto that the obligations undertaken by the Receiver under this Article XII are the sole and exclusive responsibility of the Receiver and no other Person or entity.

12.8   **Subrogation**. Upon payment by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, to any Indemnitee for any claims indemnified by the Receiver under this Article XII, the Receiver, or the Corporation as appropriate, shall become subrogated to all rights of the Indemnitee against any other Person to the extent of such payment.

### ARTICLE XIII
### MISCELLANEOUS

13.1   **Entire Agreement**. This Agreement embodies the entire agreement of the parties hereto in relation to the subject matter herein and supersedes all prior understandings or agreements, oral or written, between the parties.

13.2   **Headings**. The headings and subheadings of the Table of Contents, Articles and Sections contained in this Agreement, except the terms identified for definition in Article I and elsewhere in this Agreement, are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

13.3   **Counterparts**. This Agreement may be executed in any number of counterparts and by the duly authorized representative of a different party hereto on separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.

13.4   **GOVERNING LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA, AND IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE MAIN OFFICE OF THE FAILED BANK IS LOCATED.

13.5   **Successors**. All terms and conditions of this Agreement shall be binding on the successors and assigns of the Receiver, the Corporation and the Assuming Bank. Except as otherwise specifically provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Receiver, the Corporation and the Assuming Bank any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein, it being the intention of the parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the Corporation and the Assuming Bank and for the benefit of no other Person.

**13.6** **Modification; Assignment**. No amendment or other modification, rescission, release, or assignment of any part of this Agreement shall be effective except pursuant to a written agreement subscribed by the duly authorized representatives of the parties hereto.

**13.7** **Notice**. Any notice, request, demand, consent, approval or other communication to any party hereto shall be effective when received and shall be given in writing, and delivered in person against receipt therefore, or sent by certified mail, postage prepaid, courier service, telex or facsimile transmission to such party (with copies as indicated below) at its address set forth below or at such other address as it shall hereafter furnish in writing to the other parties. All such notices and other communications shall be deemed given on the date received by the addressee.

**Assuming Bank**

JPMorgan Chase Bank, National Association
270 Park Avenue
New York, New York 10017

Attention: Brian A. Bessey

with a copy to: Stephen M. Cutler

**Receiver and Corporation**

Federal Deposit Insurance Corporation,
Receiver of Washington Mutual Bank, Henderson, Nevada
1601 Bryan St., Suite 1700
Dallas, Texas 75201

Attention: Deputy Director (DRR-Field Operations Branch)

with copy to: Regional Counsel (Litigation Branch)

**and with respect to notice under Article XII:**

Federal Deposit Insurance Corporation
Receiver of Washington Mutual Bank, Henderson, Nevada
1601 Bryan St., Suite 1700
Dallas, Texas 75201
Attention: Regional Counsel (Litigation Branch)

**13.8** **Manner of Payment**. All payments due under this Agreement shall be in lawful money of the United States of America in immediately available funds as each party hereto may specify to the other parties; provided, that in the event the Receiver or the Corporation is obligated to make any payment hereunder in the amount of $25,000.00 or less, such payment may be made by check.

31

**13.9**   <u>Costs, Fees and Expenses</u>. Except as otherwise specifically provided herein, each party hereto agrees to pay all costs, fees and expenses which it has incurred in connection with or incidental to the matters contained in this Agreement, including without limitation any fees and disbursements to its accountants and counsel; provided, that the Assuming Bank shall pay all fees, costs and expenses (other than attorneys' fees incurred by the Receiver) incurred in connection with the transfer to it of any Assets or Liabilities Assumed hereunder or in accordance herewith.

**13.10**   <u>Waiver</u>. Each of the Receiver, the Corporation and the Assuming Bank may waive its respective rights, powers or privileges under this Agreement; provided, that such waiver shall be in writing; and further provided, that no failure or delay on the part of the Receiver, the Corporation or the Assuming Bank to exercise any right, power or privilege under this Agreement shall operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege by the Receiver, the Corporation, or the Assuming Bank under this Agreement, nor will any such waiver operate or be construed as a future waiver of such right, power or privilege under this Agreement.

**13.11**   <u>Severability</u>. If any provision of this Agreement is declared invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

**13.12**   <u>Term of Agreement</u>. This Agreement shall continue in full force and effect until the sixth (6th) anniversary of Bank Closing; provided, that the provisions of Section 6.3 and 6.4 shall survive the expiration of the term of this Agreement. Provided, however, the receivership of the Failed Bank may be terminated prior to the expiration of the term of this Agreement; in such event, the guaranty of the Corporation, as provided in and in accordance with the provisions of Section 12.7 shall be in effect for the remainder of the term. Expiration of the term of this Agreement shall not affect any claim or liability of any party with respect to any (i) amount which is owing at the time of such expiration, regardless of when such amount becomes payable, and (ii) breach of this Agreement occurring prior to such expiration, regardless of when such breach is discovered.

**13.13**   <u>Survival of Covenants, Etc</u>. The covenants, representations, and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder.

**[Signature Page Follows]**

32

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER OF: WASHINGTON MUTUAL BANK, HENDERSON, NEVADA

BY:_____

NAME:  Mitchell L. Glassman
TITLE:  Director

Attest:

_____

FEDERAL DEPOSIT INSURANCE CORPORATION

BY: _____

NAME:  Mitchell L. Glassman
TITLE:  Director

Attest:

_____

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

BY: _____

NAME:  Brian A. Bessey
TITLE:  Senior Vice President

Attest: _____

33

Exhibit F- Pg. 98

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER OF: WASHINGTON MUTUAL BANK, HENDERSON, NEVADA

BY: *Mitchell L. Glassman*

NAME:  Mitchell L. Glassman
TITLE:  Director

Attest:

*David Glenn*

FEDERAL DEPOSIT INSURANCE CORPORATION

BY: *Mitchell L. Glassman*

NAME:  Mitchell L. Glassman
TITLE:  Director

Attest:

*David Glenn*

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

BY:_____

NAME:  Brian A. Bessey
TITLE:  Senior Vice President

Attest:

_____

33

**SCHEDULE 2.1 - Certain Liabilities Not Assumed**

1.  Preferred stock and litigation pending against the Failed Bank related to liabilities retained by the receiver.

2.  Subordinated debt.

3.  Senior debt.

4.  All employee benefit plans sponsored by the holding company of the Failed Bank except the tax-qualified pension and 401(k) plans and employee medical plan.

5.  All management, employment, change-in-control, severance, unfunded deferred compensation and individual consulting agreements or plans (i) between the Failed Bank and its employees or (ii) maintained by the Failed Bank on behalf of its employees.

34

## SCHEDULE 3.2 - Purchase Price of Assets

|       |                                                                                                               |              |
|-------|---------------------------------------------------------------------------------------------------------------|--------------|
| (a)   | cash and receivables from depository institutions, including cash items in the process of collection, plus interest thereon: | Book Value   |
| (b)   | securities (exclusive of the capital stock of Acquired Subsidiaries), plus interest thereon:                  | Market Value |
| (c)   | federal funds sold and repurchase agreements, if any, including interest thereon:                             | Book Value   |
| (d)   | Loans:                                                                                                        | Book Value   |
| (e)   | Other Real Estate:                                                                                            | Book Value   |
| (f)   | credit card business, if any, including all outstanding extensions of credit:                                 | Book Value   |
| (g)   | Safe Deposit Boxes and related business, safekeeping business and trust business, if any:                     | Book Value   |
| (h)   | Records and other documents:                                                                                  | Book Value   |
| (i)   | capital stock of any Acquired Subsidiaries:                                                                   | Book Value   |
| (j)   | amounts owed to the Failed Bank by any Acquired Subsidiary:                                                    | Book Value   |
| (k)   | assets securing Deposits of public money, to the extent not otherwise purchased hereunder:                    | Book Value   |
| (l)   | Overdrafts of customers:                                                                                      | Book Value   |

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

Exhibit F- Pg. 101

| | | |
|---|---|---|
| (m) | rights, if any, with respect to Qualified Financial Contracts. | Market Value |
| (n) | rights of the Failed Bank to provide mortgage servicing for others and to have mortgage servicing provided to the Failed Bank by others and related contracts. | Book Value |
| (o) | Bank Premises: | Book Value |
| (p) | Furniture and Equipment: | Book Value |
| (q) | Fixtures: | Book Value |

36

## SCHEDULE 3.5 - Certain Assets Not Purchased

(1)      Any Financial Institution Bonds, Banker's Blanket Bonds, surety bonds (except Court bonds required for retained litigation risk), Directors and Officers insurance, Professional Liability insurance, or related premium refund, unearned premium derived from cancellation, or any proceeds payable with respect to any of the foregoing. This shall exclude Commercial General Liability, International Liability, Commercial Automobile, Worker's Compensation, Employer's Liability, Umbrella and Excess Liability, Property, Mortgage Impairment and Mortgage Errors & Omissions, Lender-placed coverage, Private Mortgage Insurance, Boiler & Machinery, Terrorism, Mail, Storage Tank Liability, Marine Liability, Vessel Hull and Vessel Pollution (if marine assets are acquired), Aircraft Liability (if aircraft assets are acquired) insurance policies, proceeds and collateral related to, held or issued with respect to or in connection with any Asset (including Bank staff) acquired by the Assuming Bank under this Agreement, which such policies, proceeds and collateral are acquired Assets.

(2)      any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing;

(3)      leased Bank Premises and leased Furniture and Equipment and Fixtures and data processing equipment (including hardware and software) located on leased or owned Bank Premises, if any; provided, that the Assuming Bank does obtain an option under Section 4.6, Section 4.7 or Section 4.8, as the case may be, with respect thereto; and

(4)      any criminal/restitution orders issued in favor of the Failed Bank;

37

# EXHIBIT 3.2(c) -- VALUATION OF CERTAIN QUALIFIED FINANCIAL CONTRACTS

**A.**   **Scope**

Interest Rate Contracts - All interest rate swaps, forward rate agreements, interest rate futures, caps, collars and floors, whether purchased or written.

Option Contracts - All put and call option contracts, whether purchased or written, on marketable securities, financial futures, foreign currencies, foreign exchange or foreign exchange futures contracts.

Foreign Exchange Contracts - All contracts for future purchase or sale of foreign currencies, foreign currency or cross currency swap contracts, or foreign exchange futures contracts.

**B.**   **Exclusions**

All financial contracts used to hedge assets and liabilities that are acquired by the Assuming Bank but are not subject to adjustment from Book Value.

**C.**   **Adjustment**

The difference between the Book Value and market value as of Bank Closing.

**D.**   **Methodology**

1.   The price at which the Assuming Bank sells or disposes of Qualified Financial Contracts will be deemed to be the fair market value of such contracts, if such sale or disposition occurs at prevailing market rates within a predefined timetable as agreed upon by the Assuming Bank and the Receiver.

2.   In valuing all other Qualified Financial Contracts, the following principles will apply:

   (i)   All known cash flows under swaps or forward exchange contracts shall be present valued to the swap zero coupon interest rate curve.

   (ii)   All valuations shall employ prices and interest rates based on the actual frequency of rate reset or payment.

   (iii)   Each tranche of amortizing contracts shall be separately valued. The total value of such amortizing contract shall be the sum of the values of its component tranches.

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

Exhibit F- Pg. 104

(iv)   For regularly traded contracts, valuations shall be at the midpoint of the bid and ask prices quoted by customary sources (e.g., <u>The Wall Street Journal</u>, Telerate, Reuters or other similar source) or regularly traded exchanges.

(v)    For all other Qualified Financial Contracts where published market quotes are unavailable, the adjusted price shall be the average of the bid and ask price quotes from three (3) securities dealers acceptable to the Receiver and Assuming Bank as of Bank Closing. If quotes from securities dealers cannot be obtained, an appraiser acceptable to the Receiver and the Assuming Bank will perform a valuation based on modeling, correlation analysis, interpolation or other techniques, as appropriate.

39

Branch :F32,User :W019                                                    Station ID :RT89

## Recording Requested By
## Fidelity National Title

AFTER RECORDING RETURN TO:
Washington Mutual Bank, FA
C/O ACS Image Solutions
12691 Pala Drive MS156DPCA
Garden Grove, California 92841

|||||||| (barcode) ||||||||
**2003-0116698**

| Recorded Official Records County Of SANTA BARBARA JOSEPH E. HOLLAND Recorder | REC FEE    67.00 |
|---|---|
| 08:00AM 27-Aug-2003 | gss Page 1 of 21 |

∂\

# SECURITY INSTRUMENT COVER SHEET
Loan Number: 0081173676

308086

Please print or type information
Document Title(s) (or transactions contained therein):

1. Deed of Trust

Grantor/Trustor/Mortgagor(s) (Last name first, then first name and initials)

1. DOUGLES GILLIES, AN UNMARRIED MAN
2.
3.
4.
☐   Additional names on page _____ of document.

Grantee/Beneficiary/Mortgagee(s)
1. Washington Mutual Bank, FA

Legal Description (abbreviated: i.e. lot, block, plat or section, township, range)
LEGAL DESCRIPTION IS HEREBY ATTACHED AND MADE A PART HEREOF.

☐   Additional legal is on page _____ of document.

Assessor's Property Tax Parcel/Account Number(s)

1. 049-111-04                           2.

3.                                      4.

This document prepared by:   Lisa Edelman
                             20001 Prairie Avenue Building 17 2nd Flr N170201
                             Chatsworth, California 91311

2636 (12-00)

DocMagic ℰℱⓇⁿⁿⁿ⁰ 800-649-1362
www.docmagic.com

Exhibit G- Pg. 106

Recording Requested By
Fidelity National Title

AFTER RECORDING RETURN TO:
Washington Mutual Bank, FA
C/O ACS Image Solutions
12691 Pala Drive MS156DPCA
Garden Grove, California 92841

————————————————[Space Above This Line For Recording Data]————————————————

Fidelity National Title 308086

# DEED OF TRUST

Loan Number: 0081173676

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document
are also provided in Section 16.

(A)   "Security Instrument" means this document, which is dated  AUGUST 12, 2003          ,
together with all Riders to this document.
(B)   "Borrower" is  DOUGLES GILLIES, AN UNMARRIED MAN


Borrower is the trustor under this Security Instrument.
(C)   "Lender" is  Washington Mutual Bank, FA, a federal association     .
Lender is a  BANK                            organized and existing under the laws of
UNITED STATES OF AMERICA                        . Lender's address is
400 East Main Street, Stockton, California 95290                .
Lender is the beneficiary under this Security Instrument.
(D)   "Trustee" is  CALIFORNIA RECONVEYANCE COMPANY
(E)   "Note" means the promissory note signed by Borrower and dated  AUGUST 12, 2003  .
The Note states that Borrower owes Lender  FIVE HUNDRED THOUSAND AND 00/100

Dollars (U.S. $ 500,000.00            ) plus interest. Borrower has promised to pay this debt
in regular Periodic Payments and to pay the debt in full not later than   SEPTEMBER 1, 2033  .
(F)   "Property" means the property that is described below under the heading "Transfer of Rights in
the Property."
(G)   "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.

CALIFORNIA
32838 (05-01)

Page 1 of 15

DocMagic eForms 800-649-1362
www.docmagic.com

Branch :F32,User :W019

Station ID :RT89

0081173676

(H)   "**Riders**" means all Riders to this Security Instrument that are executed by Borrower.   The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider      ☐ Condominium Rider                    ☐ 1-4 Family Rider
☐ Graduated Payment Rider    ☐ Planned Unit Development Rider       ☐ Biweekly Payment Rider
☐ Balloon Rider              ☐ Rate Improvement Rider              ☐ Second Home Rider
☐ Other(s) [specify]

(I)    "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J)    "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K)    "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L)    "**Escrow Items**" means those items that are described in Section 3.
(M)    "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds, whether by way of judgment, settlement or otherwise, paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N)    "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O)    "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P)    "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q)    "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in
SANTA  BARBARA _____ County, California:

LEGAL DESCRIPTION IS HEREBY ATTACHED AND MADE A PART HEREOF.

CALIFORNIA
32838 (05-01)

Page 2 of 15

*DocMagic* 📞 800-649-1362
www.docmagic.com

Exhibit G- Pg. 108

Branch :F32,User :W019                                                              Station ID :RT89

0081173676

which currently has the address of  3756 TORINO DRIVE
                                                              [Street]

Santa Barbara                  , California    93105          ("Property Address"):
     [City]                                     [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
2.    Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each

DocMagic eForms 800-649-1362
www.docmagic.com

Exhibit G- Pg. 109

0081173676

payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance of the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

CALIFORNIA
32838 (05-01)                              Page 4 of 15                    DocMagic *eForms* 800-649-1362
                                                                           www.docmagic.com

0081173676

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Lender may purchase such insurance from or through any company acceptable to Lender including, without limitation, an affiliate of Lender, and Borrower acknowledges and agrees that Lender's affiliate may receive consideration for such purchase. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

CALIFORNIA
32836 (05-01)                              Page 5 of 15                    DocMagic €Rℴℴℴ 800-649-1362
                                                                           www.docmagic.com

SANTA BARBARA, CA  Document:TD 2003.116698                                 Page:6 of 21

Printed on:12/11/2012 9:50 AM
                                                         Exhibit G- Pg. 111

Branch :F32,User :W019                                                                        Station ID :RT89

0081173676

Borrower hereby absolutely and irrevocably assigns to Lender all of Borrower's right, title and interest in and to all proceeds from any insurance policy (whether or not the insurance policy was required by Lender) that are due, paid or payable with respect to any damage to such property, regardless of whether the insurance policy is established before, on or after the date of this Security Instrument. By absolutely and irrevocably assigning to Lender all of Borrower's rights to receive any and all proceeds from any insurance policy, Borrower hereby waives, to the full extent allowed by law, all of Borrower's rights to receive any and all of such insurance proceeds.

Borrower hereby absolutely and irrevocably assigns to Lender all of Borrower's right, title and interest in and to (a) any and all claims, present and future, known or unknown, absolute or contingent, (b) any and all causes of action, (c) any and all judgments and settlements (whether through litigation, mediation, arbitration or otherwise), (d) any and all funds sought against or from any party or parties whosoever, and (e) any and all funds received or receivable in connection with any damage to such property, resulting from any cause or causes whatsoever, including but not limited to, land subsidence, landslide, windstorm, earthquake, fire, flood or any other cause.

Borrower agrees to execute, acknowledge if requested, and deliver to Lender, and/or upon notice from Lender shall request any insurance agency or company that has issued any insurance policy to execute and deliver to Lender, any additional instruments or documents requested by Lender from time to time to evidence Borrower's absolute and irrevocable assignments set forth in this paragraph.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, or remove or demolish any building thereon, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property,

CALIFORNIA
32838 (08-01)                                 Page 6 of 15                      DocMagic eFarms  800-649-1362
                                                                                www.docmagic.com

Exhibit G- Pg. 112

0081173676

Borrower shall maintain the Property in good condition and repair in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property in good and workmanlike manner if damaged to avoid further deterioration or damage. Lender shall, unless otherwise agreed in writing between Lender and Borrower, have the right to hold insurance or condemnation proceeds. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause. Lender does not make any warranty or representation regarding, and assumes no responsibility for, the work done on the Property, and Borrower shall not have any right to rely in any way on any inspection(s) by or for Lender or its agent. Borrower shall be solely responsible for determining that the work is done in a good, thorough, efficient and workmanlike manner in accordance with all applicable laws.

Borrower shall (a) appear in and defend any action or proceeding purporting to affect the security hereof, the Property or the rights or powers of Lender or Trustee; (b) at Lender's option, assign to Lender, to the extent of Lender's interest, any claims, demands, or causes of action of any kind, and any award, court judgement, or proceeds of settlement of any such claim, demand or cause of action of any kind which Borrower now has or may hereafter acquire arising out of or relating to any interest in the acquisition or ownership of the Property. Lender and Trustee shall not have any duty to prosecute any such claim, demand or cause of action. Without limiting the foregoing, any such claim, demand or cause of action arising out of or relating to any interest in the acquisition or ownership of the Property may include (i) any such injury or damage to the Property including without limit injury or damage to any structure or improvement situated thereon, (ii) or any claim or cause of action in favor of Borrower which arises out of the transaction financed in whole or in part by the making of the loan secured hereby, (iii) any claim or cause of action in favor of Borrower (except for bodily injury) which arises as a result of any negligent or improper construction, installation or repair of the Property including without limit, any surface or subsurface thereof, or of any building or structure thereon or (iv) any proceeds of insurance, whether or not required by Lender, payable as a result of any damage to or otherwise relating to the Property or any interest therein. Lender may apply, use or release such monies so received by it in the same manner as provided in Paragraph 5 for the proceeds of insurance.

8.    **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.    **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the

CALIFORNIA
32836 (05-01)                          Page 7 of 15                    DocMagic eForms 800-649-1362
                                                                       www.docmagic.com

Branch :F32,User :W019                                                                Station ID :RT89

0081173676

Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)   Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

CALIFORNIA
32838 (08-01)                                   Page 8 of 15                       DocMagic eFornss 800-649-1362
                                                                                   www.docmagic.com

0081173676

(b)    Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.    Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.   During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgement, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgement, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

0081173676

**12.   Borrower Not Released; Forbearance By Lender Not a Waiver.**  This Security Instrument cannot be changed or modified except as otherwise provided herein or by agreement in writing signed by Borrower, or any Successor in Interest of Borrower and Lender.  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successor in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.  No waiver by Lender of any right under this Security Instrument shall be effective unless in writing.  Waiver by Lender of any right granted to Lender under this Security Instrument or of any provision of this Security Instrument as to any transaction or occurrence shall not be deemed a waiver as to any future transaction or occurrence.

**13.   Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.   Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  Borrower shall pay such other charges as Lender may deem reasonable for services rendered by Lender and furnished at the request of Borrower, any Successor in Interest to Borrower or any agent of Borrower.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note.)  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.   Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise.  The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender.

CALIFORNIA
32838 (08-01)                              Page 10 of 15                       DocMagic *eForms* 800-549-1362
                                                                               www.docmagic.com

Exhibit G- Pg. 116

0081173676

Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

    **16.   Governing Law; Severability; Rules of Construction.**   This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

    As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

    **17.   Borrower's Copy.**   Borrower shall be given one copy of the Note and of this Security Instrument.

    **18.   Transfer of the Property or a Beneficial Interest in Borrower.**   As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

    **19.   Borrower's Right to Reinstate After Acceleration.**   If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgement enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency,

0081173676

instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.   Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.   Hazardous Substances.**  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substance in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use, or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Exhibit G- Pg. 118

0081173676

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.    Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. If Borrower or any successor in interest to Borrower files (or has filed against Borrower or any successor in interest to Borrower) a bankruptcy petition under Title 11 or any successor title of the United States Code which provides for the curing of prepetition default due on the Note, interest at a rate determined by the Court shall be paid to Lender on post-petition arrears.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of and event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23.    Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender or the Trustee (whether or not the Trustee is affiliated with Lender) may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24.    Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution. Trustee may destroy the Note and the Security Instrument three (3) years after issuance of a full reconveyance or release (unless directed in such request to retain them).

CALIFORNIA
32836 (08-01)

DocMagic *eForms* 800-649-1362
www.docmagic.com

0081173676

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

DOUGLAS GILLIES

CALIFORNIA
32838 (05-01)                         Page 14 of 15                    *DocMagic eForms* 800-649-1362
                                                                        www.docmagic.com

SANTA BARBARA, CA  Document:TD 2003.116698                              Page:15 of 21

Printed on:12/11/2012 9:50 AM

Exhibit G- Pg. 120

0081173676

————————————————(Space Below This Line For Acknowledgement)————————————————

State of CALIFORNIA )
                    ) SS.
County of SANTA BARBARA )

On AUGUST 19, 2003       , before me, SUSAN L. CERVANTES

California, personally appeared DOUGLAS GILLIES , a Notary Public in and for the State of

~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal

Signature *Susan L. Cervantes*
Notary Public in and for the State of California



SUSAN L. CERVANTES
Comm. # 1331300
NOTARY PUBLIC - CALIFORNIA
Santa Barbara County
My Comm. Expires Nov. 20, 2005

CALIFORNIA
32838 (06-01)                          Page 15 of 15                    DocMagic *eForms* 800-649-1362
                                                                        www.docmagic.com

SANTA BARBARA, CA  Document:TD 2003.116698                              Page:16 of 21

Printed on:12/11/2012 9:50 AM

Exhibit G- Pg. 121

Order No. 308086

# EXHIBIT "ONE"

Lot 70 of Hidden Valley, in the City of Santa Barbara, County of Santa Barbara, State of California, as per map recorded in Book 52 Pages 26 to 32, inclusive of Maps, in the office of the County Recorder of said County.

Excepting therefrom all minerals, oil, gas and other hydrocarbon substances lying below a depth of 500 feet below the surface of said land, but without the right of entry onto the surface or that portion of subsurface of said land lying above a depth of 500 feet below the surface thereof.

Assessors Parcel No: 049-111-04

2

Branch :F32,User :W019

Station ID :RT89

**FIXED/ADJUSTABLE RATE RIDER**
**(1 Year Treasury Index - Rate Caps)**

Loan Number: 0081173676

THIS FIXED/ADJUSTABLE RATE RIDER is made this __12th__ day of  __AUGUST, 2003__                ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust
or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to
__Washington Mutual Bank, FA__    ("Lender") of the same date and covering the property
described in the Security Instrument and located at:

__3756 TORINO DRIVE, Santa Barbara, California 93105__
(Property Address)

> THE NOTE PROVIDES FOR A CHANGE IN THE BORROWER'S FIXED INTEREST RATE
> TO AN ADJUSTABLE INTEREST RATE.   THE NOTE LIMITS THE AMOUNT
> BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND
> THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.   ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of __4.750__ %. The Note also provides
for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A)  Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of
__SEPTEMBER, 2008__                , and the adjustable interest rate I will pay may change on that day
every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable
interest rate, and each date on which my adjustable interest rate could change, is called a "Change
Date."
**(B)  The Index**
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The
"Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity
of one year, as made available by the Federal Reserve Board. The most recent Index figure available
as of the date 45 days before each Change Date is called the "Current Index."

4611 (02-01)                           Page 1 of 4                    DocMagic €Plume 800-649-1362
                                                                      www.docmagic.com

0081173676

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

   **(C)  Calculation of Changes**

   Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND  750/1000 _____ percentage points ( _2.750_ %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

   The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

   **(D)  Limits on Interest Rate Changes**

   The interest rate I am required to pay at the first Change Date will not be greater than _9.750_ % or less than _2.750_ %.  Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months.  My interest rate will never be greater than _9.750_ %.

   **(E)  Effective Date of Changes**

   My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

   **(F)  Notice of Changes**

   The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change.  The notice will include the amount of my monthly payment, and any information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

   **(G)  Failure to Make Adjustments**

   If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time.  I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid "Principal."

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

   1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in section A above, section 18 of the Security Instrument shall read as follows:

Exhibit G- Pg. 124

0081173676

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

  2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in section A above, Section 18 of the Security Instrument described in section B1 above shall then cease to be in effect, and the provisions of Section 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

4611 (02-01)                         Page 3 of 4              DocMagic eFormms  800-649-1362
                                                                      www.docmagic.com

Exhibit G- Pg. 125

0081173676

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.


DOUGLAS GILLIES


4811 (02-01)                       Page 4 of 4                    DocMagic eForms 800-649-1362
                                                                      www.docmagic.com

**requested by title court**

2009-0049697

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA 91311
800 892-6902
(818)775-2258 (Fax)

|  | Recorded | REC FEE | 14.00 |
|---|---|---|---|
|  | Official Records |  |  |
|  | County of |  |  |
|  | Santa Barbara |  |  |
|  | Joseph E. Holland |  |  |
|  |  | LC |  |
|  | 08:00AM 13-Aug-2009 | Page 1 of 2 |  |

Space above this line for recorder's use only

Trustee Sale No. 237917CA   Loan No. 0081173676   Title Order No. 184926

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION**, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $10,367.71 as of August 12, 2009 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of property by paying the entire amount demanded by your creditor.

SANTA BARBARA, CA  Document:ND 2009.49697                          Page:1 of 2

Printed on:12/11/2012 9:50 AM

Exhibit H- Pg. 127

Branch :F32,User :W019

Station ID :RT89

Trustee Sale No. 237917CA  Loan No. 0081173676  Title Order No. 184926

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: JPMorgan Chase Bank, National Association, at 7301 BAYMEADOWS WAY , JACKSONVILLE, FL 32256, (877) 926-8937.

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION. NOTICE IS HEREBY GIVEN THAT: CALIFORNIA RECONVEYANCE COMPANY is the duly appointed Trustee under a Deed of Trust dated 08/12/2003, executed by DOUGLES GILLIES, AN UNMARRIED MAN, as trustor, to secure obligations in favor of WASHINGTON MUTUAL BANK, FA, as Beneficiary Recorded 08/27/2003, Book , Page , Instrument 2003-0116698 of official records in the Office of the Recorder of SANTA BARBARA County, California, as more fully described on said Deed of Trust. APN: 049-111-04-00 Situs: 3756 TORINO DRIVE, , SANTA BARBARA, CA 93105 Including the note(s) for the sum of $500,000.00 that the beneficial interest under said Deed of Trust and the obligations secured thereby are presently held by the beneficiary; that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the payment has not been made of: THE 05/01/2009 INSTALLMENT OF PRINCIPAL AND INTEREST AND ALL SUBSEQUENT MONTHLY INSTALLMENTS OF PRINCIPAL AND INTEREST; PLUS ANY ADDITIONAL ACCRUED AND UNPAID AMOUNTS INCLUDING, BUT NOT LIMITED TO, LATE CHARGES, ADVANCES, IMPOUNDS, TAXES, HAZARD INSURANCE, ADMINISTRATIVE FEES, INSUFFICIENT AND PARTIAL RETURN CHECK FEES, STATEMENT FEES, AND OBLIGATIONS SECURED BY PRIOR ENCUMBRANCES.

That by reason thereof, the present beneficiary under such Deed of Trust, has executed and delivered to said Trustee, a written Declaration and Demand for Sale, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing the obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The beneficiary or its designated agent declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code 2923.5, or the borrower has surrendered the property to the beneficiary or authorized agent, or is otherwise exempt from the requirements of §2923.5.

DATE: August 12, 2009

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

STACY WHITE, Assistant Secretary

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

SANTA BARBARA, CA  Document:ND 2009.49697

Page:2 of 2

Printed on:12/11/2012 9:50 AM

Exhibit H- Pg. 128

Branch :F32,User :W019

Station ID :RT89

Recording Requested By
**ServiceLink**
RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA  91311
800-892-6902

**Trustee Sale No.**   **237917CA**
Loan No.                   0081173676
Title Order No.          184926

*3*

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

**2009-0069334**

| Recorded | REC FEE | 15.00 |
| Official Records | | |
| County of | | |
| Santa Barbara | | |
| Joseph E. Holland | | |
| | | KAM |
| 08:01AM 18-Nov-2009 | Page 1 of 3 | |

Space above this line for recorder's use only

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 08/12/2003. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On 12/07/2009 at 01:00 PM, CALIFORNIA RECONVEYANCE COMPANY as the duly appointed Trustee under and pursuant to Deed of Trust Recorded 08/27/2003, Book , Page , Instrument 2003-0116698, of official records in the Office of the Recorder of SANTA BARBARA County, California, executed by: DOUGLES GILLIES, AN UNMARRIED MAN, as Trustor, WASHINGTON MUTUAL BANK, FA, as Beneficiary, will sell at public auction sale to the highest bidder for cash, cashier's check drawn by a state or national bank, a cashier's check drawn by a state or federal credit union, or a cashier's check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state. Sale will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to the Deed of Trust. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, interest thereon, estimated fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Place of Sale: AT THE MAIN ENTRANCE TO THE COUNTY COURTHOUSE, 1100 ANACAPA STREET , SANTA BARBARA, CA

Legal Description: LOT 70 OF HIDDEN VALLEY, IN THE CITY OF SANTA BARBARA, COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 52 PAGES 26 TO 32, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.
EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND, BUT WITHOUT THE RIGHT OF ENTRY ONTO THE SURFACE OR THAT PORTION OF SUBSURFACE OF SAID LAND LYING ABOVE A DEPTH OF 500 FEET BELOW THE SURFACE THEREOF.

Amount of unpaid balance and other charges: $509,202.61 (estimated)

Street address and other common designation of the real property:      3756 TORINO DRIVE
SANTA BARBARA, CA 93105
APN Number:   049-111-04-00

Exhibit I- Pg. 129

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. The property heretofore described is being sold "as is".

In compliance with California Civil Code 2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their financial situation and to explore options to avoid foreclosure by one of the following methods: by telephone; by United States mail; either 1st class or certified; by overnight delivery; by personal delivery; by e-mail; by face to face meeting.

DATE: 11-16-2009                                    **SEE ATTACHED EXHIBIT**

CALIFORNIA RECONVEYANCE COMPANY, as Trustee
(714) 259-7850 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVE
MAILSTOP N110612
CHATSWORTH, CA 91311

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT
COLLECTOR ATTEMPTING TO COLLECT A DEBT.  ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Exhibit

## DECLARATION PURSUANT TO CALIFORNIA CIVIL CODE SECTION 2923.54

Pursuant to California Civil Code Section 2923.54, the undersigned loan servicer declares as follows:

1. It has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.54 that is current and valid on the date the notice of sale is filed; and

2. The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or Section 2923.55.

JPMorgan Chase Bank,
National Association

Name:  Ann Thorn
Title:    First Vice President

Exhibit I- Pg. 131

Branch :F32,User :W019                                                              Station ID :RT89

Recording Requested By     **Requested By**
ServiceLink                **Title Court Service**

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA  91311
800-892-6902

**Trustee Sale No.   237917CA**
Loan No.             0081173676
Title Order No.      184926

```
                          2011-0037798
              Recorded       | REC FEE        21.00
           Official Records  |
              County of      |
            Santa Barbara    |
           Joseph E. Holland |
       County Clerk Recorder |
                             |
                             | ML
         08:00AM 30-Jun-2011 | Page 1 of 2
```

Space above this line for recorder's use only

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 08-12-2003.  UNLESS YOU TAKE ACTION TO
PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE.  IF YOU NEED AN EXPLANATION OF THE
NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On 07-25-2011 at 01:00 PM, CALIFORNIA RECONVEYANCE COMPANY as the duly appointed Trustee under
and pursuant to Deed of Trust Recorded 08-27-2003, Book , Page , Instrument 2003-0116698,        of official records
in the Office of the Recorder of SANTA BARBARA County, California, executed by:  DOUGLES GILLIES, AN
UNMARRIED MAN, as Trustor, WASHINGTON MUTUAL BANK, FA, as Beneficiary, will sell at public auction sale to
the highest bidder for cash, cashier's check drawn by a state or national bank, a cashier's check drawn by a state or
federal credit union, or a cashier's check drawn by a state or federal savings and loan association, savings association,
or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state.  Sale will be
held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the
trustee in the hereinafter described property under and pursuant to the Deed of Trust.  The sale will be made, but
without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining
principal sum of the note(s) secured by the Deed of Trust, interest thereon, estimated fees, charges and expenses of
the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be
set forth below.  The amount may be greater on the day of sale.

Place of Sale: AT THE MAIN ENTRANCE TO THE COUNTY COURTHOUSE, 1100 ANACAPA STREET , SANTA
BARBARA, CA

Legal Description:  LOT 70 OF HIDDEN VALLEY, IN THE CITY OF SANTA BARBARA, COUNTY OF SANTA
BARBARA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 52 PAGES 26 TO 32, INCLUSIVE OF
MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. EXCEPTING THEREFROM ALL
MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET
BELOW THE SURFACE OF SAID LAND, BUT WITHOUT THE RIGHT OF ENTRY ONTO THE SURFACE OR THAT
PORTION OF SUBSURFACE OF SAID LAND LYING ABOVE A DEPTH OF 500 FEET BELOW THE SURFACE
THEREOF.

Amount of unpaid balance and other charges: $546,411.40 (estimated)

Street address and other common designation of the real property:     3756 TORINO DRIVE
                                                                       SANTA BARBARA, CA 93105
                                                                       APN Number:  049-111-04-00
          The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common
designation, if any, shown herein. The property heretofore described is being sold "as is".

Exhibit J- Pg. 132

Branch :F32,User :W019                                                          Station ID :RT89

In compliance with California Civil Code 2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their financial situation and to explore options to avoid foreclosure by one of the following methods: by telephone; by United States mail; either 1st class or certified; by overnight delivery; by personal delivery; by e-mail; by face to face meeting.

DATE: 06-28-2011

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

CASEY KEALOHA, ASSISTANT SECRETARY

California Reconveyance Company
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA  91311
800-892-6902

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.  ANY INFORMATION OBTAINED WILL BE USED FOR THAT

For Sales Information:
(714) 730-2727 or www.lpsasap.com
(714) 573-1965 or www.priorityposting.com

Exhibit J- Pg. 133

Branch :F32,User :W019                                                          Station ID :RT89

Recording Requested By          **Requested By ▼**
ServiceLink          **Title Court Service**          ∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥∥

-2                                                    2012-0075720

RECORDING REQUESTED BY                    Recorded         | REC FEE      21.00
CALIFORNIA RECONVEYANCE COMPANY ➤ ∼     Official Records  |
                                          County of         |
AND WHEN RECORDED MAIL TO                Santa Barbara      |

CALIFORNIA RECONVEYANCE COMPANY         Joseph E. Holland   |
9200 Oakdale Avenue                    County Clerk Recorder|
Mail Stop: CA2-4379                                         |
Chatsworth, CA  91311                                      | EC
800-892-6902                           08:00AM 08-Nov-2012 | Page 1 of 2

**Trustee Sale No.**    **237917CA**
Loan No.               0081173676
Title Order No.        184926

_____
                                              Space above this line for recorder's use only

# NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 08-12-2003.  UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE.  IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On 12-12-2012 at 9:00 AM, CALIFORNIA RECONVEYANCE COMPANY as the duly appointed Trustee under and pursuant to Deed of Trust Recorded 08-27-2003, Book , Page , Instrument 2003-0116698,      of official records in the Office of the Recorder of SANTA BARBARA County, California, executed by:  DOUGLES GILLIES, AN UNMARRIED MAN, as Trustor, WASHINGTON MUTUAL BANK, FA, as Beneficiary, will sell at public auction sale to the highest bidder for cash, cashier's check drawn by a state or national bank, a cashier's check drawn by a state or federal credit union, or a cashier's check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state. Sale will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to the Deed of Trust.   The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, interest thereon, estimated fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below.  The amount may be greater on the day of sale.

Place of Sale: Carrillo Recreation Center, 100 E. Carrillo St., Santa Barbara, CA 93101

Legal Description:  LOT 70 OF HIDDEN VALLEY, IN THE CITY OF SANTA BARBARA, COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 52 PAGES 26 TO 32, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND, BUT WITHOUT THE RIGHT OF ENTRY ONTO THE SURFACE OR THAT PORTION OF SUBSURFACE OF SAID LAND LYING ABOVE A DEPTH OF 500 FEET BELOW THE SURFACE THEREOF.

Amount of unpaid balance and other charges: $569,667.20 (estimated)

Street address and other common designation of the real property:     3756 TORINO DRIVE
                                                                      SANTA BARBARA, CA 93105
                                                                      APN Number:    049-111-04-00

**SANTA BARBARA, CA  Document:NT 2012.75720**                                    Page:1 of 2

Printed on:12/11/2012 9:50 AM

Exhibit K- Pg. 134

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. The property heretofore described is being sold "as is".

In compliance with California Civil Code 2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their financial situation and to explore options to avoid foreclosure by one of the following methods: by telephone; by United States mail; either 1st class or certified; by overnight delivery; by personal delivery; by e-mail; by face to face meeting.

DATE: 11-08-2012

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

MARIA MAYORGA, ASSISTANT SECRETARY

California Reconveyance Company
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA 91311
800-892-6902

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

For Sales Information:
www.lpsasap.com or 1-714-730-2727
www.priorityposting.com or 1-714-573-1965
www.auction.com or 1-800-280-2832

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, this information can be obtained from one of the following three companies:
LPS Agency Sales & Posting at (714) 730-2727, or visit the Internet Web site www.lpsasap.com (Registration required to search for sale information) or Priority Posting & Publishing at (714) 573-1965 or visit the Internet Web site www.priorityposting.com (Click on the link for "Advanced Search" to search for sale information), or auction.com at 1-800-280-2832 or visit the Internet Web site www.auction.com, using the Trustee Sale No. shown above. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

SANTA BARBARA, CA  Document:NT 2012.75720                                              Page:2 of 2

Printed on:12/11/2012 9:50 AM

Exhibit K- Pg. 135